The MERCHANTS NATIONAL
BANK OF MOBILE

v.

The UNITED STATES.

Congressional Reference No. 1–80.

United States Claims Court.

April 30, 1984.

Robert H. Koehler, Washington, D.C., attorney of record, for plaintiff. Richard J. Conway, Patton, Boggs & Blow, Washington, D.C., David C. Hannan, and Johnstone, Adams, May, Howard & Hill, Mobile, Ala., of counsel.

Stephen G. Anderson, Washington, D.C., with whom was Asst. Atty. Gen. J. Paul McGrath, for defendant. David M. Cohen, Washington, D.C., and Richard L. Frenette, Alexandria, Va., of counsel.

## REPORT AND OPINION

SPECTOR, Senior Judge (designated Hearing Officer).

Following a favorable report by the Committee on the Judiciary of the United States Senate, Senate Resolution 291 was passed and referred to the United States Court of Claims. The Resolution provides as follows:

> To refer the bill S. 2052 entitled "A bill for the relief of the Merchants National Bank of Mobile" to the Court of Claims.[1]
>
> *Resolved*, That the bill (S. 2052 entitled "A bill for the relief of The Merchants National Bank of Mobile", now pending in the Senate, together with all the accompanying papers, is referred to the Chief Commissioner of the United States Court of Claims,[2] and the Chief Commissioner shall proceed with the same in accordance with the provisions of sections 1492 and 2508 [3] of title 28, United States Code, notwithstanding the bar of

any statute of limitation, laches, or bar of sovereign immunity, and report thereon to the Senate, at the earliest practicable date, giving such findings of fact and conclusion thereon as shall be sufficient to inform the Congress of the nature and character of the demand of the claim, legal or equitable, against the United States, or a gratuity in the amount, if any, legally or equitably due from the United States to the claimant.

The bill (S. 2052) referred to the court reads as follows:

> *Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the Secretary of the Treasury is authorized and directed to pay, out of money in the Treasury not otherwise appropriated, the sum of $809,609 to The Merchants National Bank of Mobile, Alabama, in full settlement of all its claims, legal or equitable, against the United States as compensation for losses sustained as a result of actions and conduct including, but not limited to, misrepresentation, whether negligent or intentional, of the Defense Logistics Agency, and its fiscal agent the Federal Reserve Bank of Atlanta, during the period 1976–1978 concerning the cancellation of a Government loan guarantee and the subsequent issuance of a second loan guarantee on reduced term.

### Introduction and General Overview

This case involves four primary participants, namely, The Merchants National Bank of Mobile (Merchants); Dri-Mix Products Corp. (Dri-Mix); the Defense Logistics Agency, within the Department of Defense (DLA), including its field agency, the Defense Personnel Support Center (DPSC); and the Federal Reserve Board, including the Federal Reserve Bank of Atlanta (Fed).

---

1. Now, United States Claims Court. *See* 28 U.S.C. § 1492, as amended April 2, 1982, Pub.L. 97–164, 96 Stat. 40.

2. Now, Chief Judge of the United States Claims Court. *See* 28 U.S.C. § 2509, as amended April 2, 1982, Pub.L. 97–164, 96 Stat. 42.

3. Should apparently read "2509."

Dri-Mix was awarded two contracts for the assembly of Meal, Combat, Individuals (MCIs) and accessories (essentially, successors to the old "C-Ration"). The contracts called for the final assembly of various Government-furnished materials (GFM) (cans of meat, fruit, and the like) into individual, nutritionally balanced meal units. The individual meal units were then assembled into cases, and eventually into larger units for shipping. A third contract called for Dri-Mix to supply a cocoa beverage mix that was to be incorporated into the MCIs, and a fourth contract called for Dri-Mix to supply "accessory pouches" to be incorporated into the MCIs.

Substantial problems and delays developed with regard to the shipment of GFM by the DLA. The MCI contracts required the DLA to supply 20 percent of each component to be incorporated into the MCIs, at certain set intervals. This essential contract plan was to permit Dri-Mix to place the various components in an efficient manner around the assembly lines so that finished units would flow off the end of the assembly line. The contract would thus become self-financing from contract payments after the initial start-up costs were incurred.

However, the DLA failed to deliver the GFM in the timely and orderly manner contemplated in the MCI contracts. Dri-Mix received all or nearly all of most components, but none of one of the meat components. Without the meat component, Dri-Mix could not even begin production and assembly of the units. Consequently, the delivery dates for the contracts had to be amended and extended on several occasions. Dri-Mix was not at fault for these delays in the furnishing of the components by the DLA.

Meanwhile, Dri-Mix was also forced to expend large sums for extra warehouse space, demurrage charges, and labor costs because the Government had breached the MCI contracts by failing to deliver the components (GFM) in a timely and orderly manner, and by oversupplying components which could not be assembled. Moreover, while Dri-Mix was incurring these unanticipated expenditures, it was not receiving any contract progress payments from the Government because it could not produce any complete MCI units. The resulting cost escalation, and the absence of any cash flow, outstripped both Dri-Mix's estimated start-up costs and its available credit. Dri-Mix sought a Government-guaranteed V-Loan to obtain additional operating capital through its regular bank, the plaintiff herein. The Merchants National Bank (Bank or Merchants) filed an application for the V-Loan (hereinafter known as V-Loan I) with the Fed, as required. The loan guarantee was subsequently approved by the DLA, also as required. The Fed, acting as the DLA's fiscal agent, then entered into the V-Loan I agreement with Merchants.

When almost the entire guaranteed amount had been advanced by Merchants, the DLA revoked the loan guarantee. The DLA apparently reversed its initial interpretation of the applicable statute and decided that it did not have authority to enter into V-Loan I. Bank officials were shocked by the sudden turn of events which left Merchants without a guarantee for the money it had already loaned to Dri-Mix.

The DLA told Merchants that the only way to remedy the situation was through an amendment to the 1978 Defense Appropriations Act, earmarking money specifically for V-Loans. DLA provided the language for the necessary appropriations bill, and promised to "stand by" the Bank and to do all it could to help out. Merchants was concurrently being advised that there was a severe shortage of MCIs and that the Armed Services were in urgent need of them worldwide. Merchants decided to cooperate with DLA by continuing to finance Dri-Mix, until the necessary loan guarantee could be authorized and re-issued.

Congress thereafter appropriated $5 million for V-Loans. Merchants applied for a new V-Loan, expecting the DLA to stand by its prior assurances. By this time, however, Dri-Mix had produced a substantial quantity of MCIs, and DLA no longer had

an urgent need for them. Merchants applied for a new V-Loan (hereinafter known as V-Loan II) in the amount of 85 percent of $2.6 million, but DLA refused to stand by its earlier assurances. Hard bargaining ensued, and Merchants accepted a "take it or leave it" offer. Although by that time a larger guarantee was needed due to interim financing, the V-Loan II guarantee was for substantially less than the original guarantee. Furthermore, as a condition to issuing it, DLA required the Bank to advance an additional $500,000 in an unguaranteed line of revolving credit.

Subsequently, Dri-Mix was unable to meet its payroll and filed for Chapter 11 reorganization. Merchants attempted to work with DLA in order to continue Dri-Mix's MCI production. DLA, however, refused to cooperate because its officials felt that they had received what they needed from the contractor and sought to minimize DLA losses. Dri-Mix was forced to file in bankruptcy for liquidation. DLA terminated the Dri-Mix contracts for default, although it expected that the default termination would be converted to a termination for the convenience of the Government because of the delay and disruption caused by its breach in failing to furnish GFM in a timely and orderly manner. The trustee in bankruptcy for Dri-Mix sued to have the termination changed to a termination for convenience and for damages, and DLA counterclaimed for damages. The trustee in bankruptcy eventually settled Dri-Mix's claim against the Government for $1.7 million. In this Congressional Reference, Merchants now seeks equitable relief to recover its losses on the MCI and related contracts.

### Detailed Findings of Fact

#### Background

Dri-Mix was founded in 1970 with its principal place of business in Mobile, Alabama. Its principal officers were Messrs. Richard Kanehl and Richard Williams. Kanehl lived in Mobile, was President of Dri-Mix, and was responsible for its day-to-day operations. Williams lived in Connecticut,

was Vice-President of Dri-Mix, and was principally responsible for handling the company's financial matters. At the time of trial, Kanehl was president of a food packaging business in Georgia. Prior to the founding of Dri-Mix he had acquired college credits in business administration, had worked for Standard Brands and General Foods Corporation, and had served as financial planning manager for the latter's Kool Aid Division and in its International Division as financial planning manager for worldwide military and export sales. He had also worked for General Foods as a military sales representative in the southeastern United States and as a manager of Government specification sales for troop feeding.

At the time of trial, Williams was manager of financial systems for Olin Corporation, Stamford, Connecticut. He holds the degrees of B.S. in Accounting (Notre Dame), LL.B. (Columbia), and M.B.A. in Finance (N.Y.U.). He too worked for General Foods for 10 years, essentially in the financial area, moving from corporate planning and analysis to manager of financial analysis in the International Division to acting Comptroller of a subsidiary in Australia, and as a financial systems consultant. Thereafter, he worked 10 years for a subsidiary of Bristol Myers, as a project manager for financial systems development.

Dri-Mix was initially established to market a beverage base powder. In late 1970, it was awarded its first Government contract. From 1970 through 1974, the company's business grew steadily and by the end of 1974 the principal source of the company's business was Government contracts. Those contracts were almost exclusively awarded by the Defense Personnel Support Center, a field activity of DLA, and required Dri-Mix to provide packaged processed foods. In performing these contracts, Dri-Mix would purchase ingredients, mix them in proportions required by specification, and package the mixed product. In 1975, DPSC awarded nine Government contracts to Dri-Mix with a total value of

$1,711,127.96. Dri-Mix performed these contracts well and in very short time periods.

Dri-Mix's dealings with Merchants also began in 1970. During the period 1970 through 1975, Merchants was Dri-Mix's primary source of start-up financing. The Bank official handling the Dri-Mix account was Anthony Patrick. Initially, Merchants made loans to Dri-Mix on the basis of invoices for delivered product. In March 1971, the Bank began what became its general practice of loaning money to Dri-Mix to finance initial contract performance after taking an assignment of the contract proceeds as collateral. Generally, Dri-Mix would require about 15 to 20 percent of the contract price as initial financing. From 1971 through 1974, Dri-Mix's total indebtedness to Merchants never exceeded $150,000.

Dri-Mix did not have a formal credit line with Merchants. It would customarily bid on a contract and after receiving award, Kanehl or Williams would speak to the Bank about specific financing arrangements. In 1975 and 1976, Merchants became concerned that Dri-Mix was becoming too leveraged. As a result, the Bank took a number of steps to reduce the amount of Dri-Mix's borrowing and to ensure that it maintained a proper and secured position.[4]

### The MCI, Cocoa Mix, and Accessory Bag Contracts

On May 19, 1976, DPSC issued a solicitation for the final assembly of 2,987,165 boxes of MCIs. Pursuant to the terms of the solicitation, the contractor was to assemble 41 different prepackaged items into individual meal units or cartons, package the meal units into cases, place the cases on pallets, and load the pallets onto railroad cars. All 41 components were to be supplied by the Government as GFM. Dri-Mix was the low bidder on the solicitation at $1.467 per box. On July 19, 1976, the contract was awarded to Dri-Mix in the amount of $4,368,986.

Additionally, Dri-Mix was the low bidder on two other solicitations to provide components to be included in the MCIs. Dri-Mix was awarded both contracts. One of these contracts, awarded August 26, 1976, in the amount of $750,368.67, required Dri-Mix to supply a cocoa beverage powder. The other contract was for the manufacture of "accessory bags" containing several small items, including toilet paper and cigarettes. It was awarded on August 31, 1976, in the amount of $342,013.24. The accessory bag contract is of slightly less importance to this case because both the V-Loan guarantees earlier described related to the MCI and cocoa mix contracts.

The MCI contract provided that about 20 percent of each component would be delivered by the Government in monthly shipments. The shipments were scheduled to begin November 22, 1976, and end on April 26, 1977. From a mechanical point of view, Mr. Kanehl considered the MCI contract to be easier to perform than most of Dri-Mix's prior contracts because it involved only assembly, rather than production and assembly. However, the contract volume was much larger than in any prior contract. Dri-Mix intentionally designed its assembly facilities in anticipation of receiving five approximately equal shipments of the GFM, as the contract contemplated. Since the amount of GFM on hand at any time was to be 20 percent, Dri-Mix planned to set up 12 conveyor belts in its production facilities and to position particular components around the conveyors at specific intervals designed to maximize efficiency. Additionally, because the contract was divided into five production cycles, this also served to make the contract self-financing. The income from each production run would finance the following production run. Consequently, Dri-Mix anticipated that it would need less than $300,000 to finance the initial production run.

In preparation for its bid, Dri-Mix inspected the facilities and production meth-

---

**4.** For example, the Bank required Dri-Mix to issue certified financials on an annual basis, to publish quarterly reports, and to provide these documents to the Bank.

ods of the prior holder of the MCI assembly contract, it conducted a time and motion study, and it estimated the number of railroad cars that it would receive each day. Once the components (GFM) were received, they were to be off-loaded into a warehouse pending initiation of assembly and shipment. Once a full assortment of components was received, they would be placed around the assembly line in proper quantities to achieve maximum efficiency.

Dri-Mix further planned to place cartons on each conveyor. While the carton was moving, a worker would take a component and put it into the designated space in the carton. As the carton continued down the line, another worker would similarly place another component in the carton, continuing this process until all 41 components were in the carton and the MCI was completed. The MCI was then placed in a shipping case holding 12 such cartons. Forty-eight cases were then put on a pallet. The pallet would then be unitized to make it waterproof and then proceed through an automatic strapper. Finally, the pallet would be placed directly into a railroad car for shipping. In order for this plan to work, it was imperative to have a complete and proper mix of components on hand. Absent that, not a single MCI could be assembled, packed, and shipped.

The contract appeared to be no more difficult than previous contracts which had been successfully performed by Dri-Mix. Production methods were carefully planned. The contract was intentionally designed to maximize efficiency and to minimize outside financing.

*GFM Delivery Problems and Delays*

MCI production was scheduled to begin in November 1976. However, the Government did not make certain meat components available until the Spring of 1977. Dri-Mix was informed of this delay almost immediately after it was awarded the MCI contract. Nonetheless, Dri-Mix was required to accept delivery of all of the other 41 components, as originally scheduled. In fact, many of these components were delivered to Dri-Mix ahead of the original contract schedule. This combination of non-delivery of meat components, and the unscheduled and premature delivery of the other components which could not be assembled, had a profoundly adverse effect on Dri-Mix's costs and on its ability to perform. Dri-Mix received as much as 60 to 100 percent of some components in one shipment. Moreover, by the time the missing meat components began to arrive, Dri-Mix had received nearly 100 percent of all the other components. This occurred because the contractors who produced the components for DLA could not be paid until they had shipped their particular components to Dri-Mix. DPSC entered into contracts with the component suppliers under terms that encouraged shipment of components as quickly as possible and as a condition of payment. There was thus an inconsistency between the contract with Dri-Mix and the contracts with the suppliers of components. DPSC had structured the MCI contract to comport with Dri-Mix's production plans, but it then failed to conform its contracts with component suppliers to the monthly 20 percent shipping limit of all components, which the Dri-Mix contract contemplated.

Dri-Mix therefore required much greater warehouse space than it could have originally anticipated. It could not reduce its huge and unbalanced inventory of components without production. The additional expenses for warehouse space and associated labor costs, and the inability to generate earnings through production, dramatically outstripped Dri-Mix's credit projections as made at the time it bid on the MCI contract. Dri-Mix made several attempts to limit the inflow of unneeded MCI components. These attempts were unsuccessful. At one point, a Mr. Stanky of DLA had informed Dri-Mix officials that the pre-award survey illustrated that Dri-Mix had more than adequate space for all the GFM. This was inaccurate. Dri-Mix had acquired 200,000 to 250,000 square feet of space in preparation for the MCI contract. Ultimately, Dri-Mix required well in excess of 500,000 square feet of warehouse space to

store the unbalanced and premature GFM inventory. Dri-Mix was forced to acquire warehouse space throughout the City of Mobile, and when no more space was available in Mobile, it acquired additional space across the bay in Fair Hope, Alabama.

This was not the only problem. The sheer quantity of materials to be handled hindered Dri-Mix's ability to constructively store and place the GFM for eventual placement around the assembly lines. Dri-Mix officials had their hands full just trying to figure out where to warehouse all the GFM. At one point 300 railroad cars bearing shipments of components were waiting to be unloaded in the Mobile stockyard. Needless to say, this caused a substantial bottleneck for the railroad. A nationwide rail embargo was therefore placed on Dri-Mix until it unloaded those cars. The embargo and demurrage charges for the cars in the stockyard placed additional pressure on Dri-Mix to unload the cars as quickly as possible and also resulted in the placement of GFM in distant warehouses without regard to constructive storage leading to efficient assembly.

Further delays also developed when the meat components were eventually replaced with a substitute. The new component was a different type of meat and was in a larger can, in order to meet nutritional requirements. Although substitution was ordered in the MCI contract, the new component did not meet the original size specifications. Consequently, the substituted component would not fit into the carton as it had been originally designed.

Throughout the period of delays and excessive costs caused by the late and unbalanced delivery of GFM, Dri-Mix officials were in constant contact with DLA and DPSC. At a meeting with the Commander of the Procurement Office, Dri-Mix officials raised the issue of these delays and additional expenses. Mr. Kanehl's testimony recounts his response to a request from the Procurement Office to estimate the additional expenses. He testified:

We have all this additional expense and we were asked by the ACO to write a letter estimating the additional charges we were incurring because of the delay! And at that time we were putting on additional trucks and additional people and forklifts and everything else that goes along with the logistical support of that kind of an operation.

So, we really weren't able at that time to give them a number. We came up with some estimates, I believe. And they said, "Well, look, they'll do everything they can and,"—Mr. Rosen in a meeting at that time said, "Well, we know that the Government has a liability that there is probably going to be a claim against the Government." And since everybody was speaking so openly, we felt fairly comfortable because they were telling us they needed C-rations. They'd do everything they could to [help] * * *.

In fact, DLA officials gave Dri-Mix repeated assurances that they had an urgent need for MCIs worldwide and that they would do everything they could to help Dri-Mix because the Government was responsible for the delays. These assurances assuaged many of Dri-Mix's anxieties at that time.

### The Impact of Delayed and Unbalanced GFM on Dri-Mix's Financing Requirements

As a result of the foregoing, Dri-Mix's MCI-related financing requirements escalated dramatically between November 1976 and January 5, 1977. The increase was due solely to the fact that Dri-Mix could not start MCI production and generate contract earnings, and because it was forced to store far greater quantities of components than it could have anticipated. The consequent lack of production meant that the MCI contract was no longer self-financing, as planned. Dri-Mix's expenditures during this period escalated past the anticipated $200,000 to $300,000 in start-up costs, without relief in sight. Dri-Mix's plans for both a self-financing contract and for efficient production had vanished because of DLA's breach of contract due to its inability to coordinate the delivery of GFM as prom-

ised. Dri-Mix needed a source for large sums of operating capital, and it needed those sums quickly if it was going to complete the MCI contract.

As earlier mentioned, between 1975 and 1976 Merchants had become concerned about Dri-Mix being too leveraged. Dri-Mix's credit balance had increased substantially in 1975. On October 29, 1975, Dri-Mix's borrowing peaked at $707,705.03. Also as previously mentioned, Merchants took several steps at this point to reduce Dri-Mix's debt and to ensure that it maintained a proper, secured, position. As a consequence of Merchants' actions, Dri-Mix and Merchants reached an informal understanding that the Dri-Mix line of credit would not exceed $500,000. Dri-Mix also reduced its average credit balance to a sum substantially below $500,000. In 1976, the closing balance for any date prior to the award of the MCI contract fluctuated between $80,000 and $505,000 and was usually in the $200,000 to $300,000 range.[5]

Following the award of the MCI contract and the delay and disruption in furnishing GFM, Dri-Mix's credit balance started to rise once again. In October 1976, Merchants took additional action to limit its exposure by formal imposition of a $500,-000 credit limit. Merchants took this action because Dri-Mix's credit balance had grown beyond the informal $500,000 limit. However, Dri-Mix officials also recognized that if this limit were imposed across the board, Dri-Mix would not have sufficient cash to complete its contracts already in production. Merchants permitted Dri-Mix to continue borrowing to finance the contracts it had in production. Those prior contracts were eventually completed and the borrowings associated with them were retired. At the same time, Merchants applied the $500,000 limit to all Dri-Mix con-

tracts that were not then in production, including the MCI, cocoa beverage mix, and accessory bag contracts. Merchants was clearly proceeding in a prudent and conservative manner to control Dri-Mix borrowings while at the same time avoiding unilateral, arbitrary, or disruptive action.

### V-Loan I

Dri-Mix's financial requirements had continued to escalate because of the delays and disruption caused by DLA's failure to properly coordinate GFM delivery. Merchants, Dri-Mix's primary source of credit,[6] would not lend more than $500,000 to finance MCI production. Dri-Mix considered asking DLA for contract progress payments in order to solve the cash flow problem, but it rejected this course of action when it became clear that without production there would be no progress, and hence no contract progress payments. This was a labor-intensive contract, and there was no payment for that labor until MCIs were assembled and shipped.

Mr. Williams of Dri-Mix had reviewed the Armed Services Procurement Regulations (ASPR) for a potential solution. He noted a seldom used program to guarantee loans for working capital under Regulation V of ASPR Appendix E. Dri-Mix contacted Mr. Patrick of Merchants to inform him about the loan guarantee program and to request that he follow up on the procedure. Patrick initially contacted the Federal Reserve Bank of New Orleans which directed him to Mr. John Branscomb, Assistant Vice President of the Federal Reserve Bank of Atlanta. After several telephone conversations, Branscomb provided Patrick in a letter of January 7, 1977 with an application, a copy of a V-Loan Guarantee Agreement, a copy of a Loan Agreement used in coordination with the V-Loan Guarantee Agree-

---

5. On July 19, 1976, Dri-Mix's credit balance was $200,000. The fluctuation in the credit balance was directly related to the number of contracts being performed at any particular time and the stage of production of each contract. The outstanding credit balance would increase when a contract was begun and decrease as the contract was being performed and completed.

6. Dri-Mix's MCI-related production plans required a substantial investment in new equipment, amounting to over $850,000. The equipment purchase was financed by Westinghouse Credit and Ford Motor Credit. The financing arrangements required Dri-Mix to pay $85,000 per year for the purchased equipment.

**188**

ment, and a copy of a thesis which he, Branscomb, had written on the subject in graduate school. The thesis stated in part:

Regulation V has proven itself to be a means of providing the necessary financing for war and defense contractors in the past and the advantages offered previously are still needed. There are many strong reasons for banks to take advantage of the V-loan protection. The first, of course, is the guarantee itself, the promise of the guarantor to purchase the guaranteed portion of the loan. This factor eliminates some of the risk of non-performance on the part of the contractor, which is assumed entirely by the lender if he takes an assignment of the claim without benefit of a guarantee. Second, the V-loan program provides a means for smaller and medium sized banks to finance their defense contractor customers to the extent necessary without the problem of exceeding their legal loan limit. Third, the program enables banks to finance loans they might ordinarily refuse, thus increasing deposits and building a base for possible future business. Finally, the government is a good partner to have if a serious financial problem should develop during the course of the loan.

After reviewing the thesis and the other forms and materials supplied by Branscomb, Dri-Mix and Merchants officials decided that applying for a V-Loan would be an appropriate solution for solving Dri-Mix's financing problem, which in turn grew out of the GFM problem. A V-Loan application was filed with the Fed on January 19, 1983. It requested an 85 percent guarantee of $1,618,000 in revolving credit. The application stated that the guaranteed loan would be used as "[w]orking capital per cash flow sheet *required primarily by four month delay of Defense Personnel Federal Support Center in assembling components.*" (Emphasis supplied.) The guaranteed funds were to be used solely for the performance of the MCI and cocoa

beverage mix contracts. The application was accompanied by a cash flow sheet dated January 13, 1977. It showed a $1,618,000 requirement in the column denominated "Net Accommodation Required". Included in the cash flow projections were the annual finance charges associated with the $850,000 in capital expenditures for purchased equipment.[7]

Branscomb of the Fed forwarded Merchants' application to the DLA on January 24, 1977, for approval. Within the DLA, the Office of the Comptroller has primary responsibility for the V-Loan program. A Mr. Peter Tovar, Contract Finance Officer, was assigned to be the primary action officer. Tovar reviewed the Bank's application and became concerned that the credit requirements shown in the cash flow sheet were overstated. Specifically, Tovar questioned the possible use of guaranteed funds for capital equipment and the possible inclusion of costs of other contracts in the computation of Dri-Mix's financing requirement. Tovar raised these concerns with Branscomb, who passed them on to Merchants and Dri-Mix officials. Thereafter the cash flow sheet was revised, eliminating all capital expenditures and expenditures not related to the MCI and cocoa mix contracts. The "Net Accommodation Required" column of the revised cash flow sheet then showed a $1,204,000 loan requirement.

Pursuant to ASPR Appendix E, the Fed conducted a financial analysis of Dri-Mix. The Fed normally would have conducted a field investigation as part of this analysis, but DLA waived this, concluding that its own pre-award survey was sufficient. The Fed provided Tovar with its report and recommendation on the revised application by letter of February 18, 1977. It recommended approval of an 85 percent guarantee of revolving credit in the amount of $1,204,000, and it also recommended that the "asset formula"[8] provision included in the standard Loan Agreement form be

---

7. Note 6, *supra.*

8. A formula which would limit the amount to be loaned under a guarantee to the value of work performed.

waived. The report stated, "[i]t is further recommended that the asset formula provision be waived in order to ensure that sufficient funds are provided. The degree of risk appears reasonable when the amount of the loan requested, $1,204,-000.00, is related to the total contract value upon completion, $5,119,336.74."

It is important to note that almost immediately after the application for the V-Loan was filed, Patrick of Merchants and Kanehl and Williams of Dri-Mix received assurances that the V-Loan application would be approved. For example, Branscomb's file notes at the Fed indicate that on January 24, 1977, Commander Parsons of DPSC indicated that the agency was ready to proceed with the approval of the V-Loan application. Branscomb advised Patrick that he was reasonably certain that the V-Loan would be approved. Williams testified that he had received assurances from the DLA and the Fed that the V-Loan would be approved. Kanehl also testified that he had received similar assurances.

Accordingly, Merchants continued to advance money to Dri-Mix pending approval of the V-Loan application. The Bank's advances on MCI-related contracts substantially exceeded its prior $500,000 limit. The Bank exceeded this limit solely because it felt reasonably certain that the loan guarantee would be approved. Merchants would not have exceeded the $500,-000 mark for new financing without assurances creating a reasonable certainty that the V-Loan guarantee would be officially approved.

On March 9, 1977, Merchants was advised that the DLA had in fact officially approved V-Loan I, for 85 percent of $1,400,000, at 10 percent interest. By letter of March 17, 1977, from Branscomb, Merchants and Dri-Mix received the actual V-Loan Guarantee Agreement for V-Loan I together with the related Loan Agreement. The V-Loan Guarantee Agreement was for 85 percent of $1,400,000, at 10 percent interest, as previously approved. Contrary to the recommendation of the Fed, an asset formula limiting the outstanding loan bal-

ance was also included in the Loan Agreement. The V-Loan Guarantee Agreement sent to Merchants was a standard pre-printed form. Several additional terms were added including the following:

(5) The loan shall be made upon the terms and conditions as to security and otherwise set forth in a certain Loan Agreement between the Financial Institution [Merchants] and the borrower [Dri-Mix].

Additionally, section 13 of the V-Loan Guarantee Agreement states:

Section 13. Effect of Violation
of Agreement

(A) If The Financing Institution shall violate, or fail to comply with, any of the terms of this agreement or any of the terms or conditions of the loan or shall through *gross negligence* make a material misrepresentation of fact in the application therefor, or in anything constituting a part of the application, it shall become liable to the Guarantor in an amount equal to the damages sustained by the latter by virtue of such violation, failure to comply, or misrepresentation; *but the Guarantor shall not be relieved by such violation, failure to comply, or misrepresentation from any of its obligations to the Financing Institution* under the terms of this agreement.

(B) In the absence of *gross negligence* on the part of the Financing Institution:

(1) No invalidity or ineffectiveness of any collateral or of any assignment thereof accepted by the Financing Institution; and

(2) *No action or omission to act on the part of the Financing Institution in reliance on a statement or certificate signed by an appropriate officer or member of the Borrower* with respect to the financial condition, business or operations of the Borrower or the purpose for which funds of the Borrower have been or are intended to be used; *shall constitute a violation of, or failure to comply with, any of the terms of this agreement or any of the terms or*

*conditions of the loan on the part of the Financing Institution. No invalidity of any provision of the loan agreement* (or other similar instrument), if any, referred to herein, *arising from statute* or decision of any court, *shall in any way relieve the Guarantor hereunder.* [Emphasis supplied.]

Paragraph 1 of the accompanying Loan Agreement states:

1. *Loan Amount, Asset Formula, Repayment:* Financing Institution will make to Borrower a loan in the form of a revolving credit, the aggregate advance of which, at any one time, shall not exceed $1,400,000.00 and Financing Institution, in the exercise of its discretion, may make advances on said loan to borrower from time to time, subject to the limitations and conditions set forth in this agreement. The loan is to be based on an asset formula, and the balance outstanding at any one time shall not exceed the sum of the following with respect to assigned contracts: (i) 90% of accounts receivable, (ii) 90% of finished goods on hand and *work in process* [emphasis supplied], and (iii) 90% of inventories on hand and either paid for or to be immediately paid for from the proceeds of the Loan. All credit extended hereunder shall be repaid in full, including principal and interest, not later than August 30, 1977. All loans, including extensions of credit, made by the Financing Institution to the Borrower pursuant to this agreement (hereinafter collectively referred to as the "Loan"), shall be subject to the terms and conditions of this agreement and the Guarantee Agreement. The Loan and each advance on the Loan shall be evidenced by a promissory note or notes * * *.

Paragraphs 5 and 6 of the Loan Agreement state:

5. *Advances:* The Financing Institution will make no advances to Borrower under the loan unless Borrower, at the time of requesting each advance, shall furnish to Financing Institution a certified statement showing the purposes for which the proceeds of such advance are to be used, and shall also furnish to Financing Institution such other written statements or information as Financing Institution may deem necessary to establish that such proceeds are to be applied to the purposes set out in paragraph 6 below:

6. *Proceeds of Advances:* Borrower will use the proceeds of advances on the loan solely to provide or replenish working capital in connection with or on account of those contracts listed on Schedule A, whether or not canceled or terminated; it being understood and agreed that working capital will include only the payment of wages, salaries, services, other operating expenses, and the purchase of materials and supplies.

Mr. Patrick of Merchants had several questions about the V-Loan Guarantee Agreement and the Loan Agreement after reviewing them, because the Government did not furnish any written explanations. Patrick wanted to make sure that Merchants would be administering the loan properly and legally. He directed his questions to Mr. Branscomb of the Fed, who was now acting as the DLA's fiscal agent for the V-Loan I guarantee. In response to these questions, Branscomb gave several assurances to Merchants. First, he advised the Bank that V-Loan I could be used to guarantee the money which had been advanced to Dri-Mix for the two guaranteed contracts on the basis of assurances of approval but prior to official approval of V-Loan I, as long as the asset formula requirements were satisfied.[9] Second, Pat-

---

9. Mr. Branscomb apparently checked this with Mr. Tovar of DLA before making any commitments. In addition to these assurances, it is noteworthy that the revised credit accommodation requirements which had been submitted to the Fed and the DLA, included V-Loan I advances made prior to official approval. The 85 percent of $1,400,000 figure was based on the inclusion of these advances for the two guaranteed contracts before the V-Loan I papers were formally signed. Hence, the DLA certainly knew and expected Merchants would use the guarantee to cover advances made in anticipation of approval of the V-Loan I guarantee.

rick was particularly concerned about computation of the asset formula. The MCI contract was a labor-intensive contract. It involved the unloading, assembly, and reloading of GFM. Patrick therefore wanted assurances that *wages and salaries* could be included in computing new advances under the asset formula. Branscomb advised Patrick that *wages and salaries* were considered to be "work in progress" and therefore were considered to be collateral for the asset formula computation.[10]

Third, Patrick had several questions about the Loan Agreement's requirement that the "Borrower, at the time of requesting each advance, shall furnish to Financing Institution a certified statement showing the purposes for which the proceeds of such advances are to be used * * *." The Government did not supply any type of form for reporting advances. Consequently, Patrick, Williams, and Kanehl devised a form designed to meet the terms of the Loan Agreement. Patrick submitted this form to Branscomb on several occasions for his input. Branscomb approved the form developed for V-Loan I as being sufficient.

In summary, Merchants proceeded cautiously, conservatively and prudently in order to assure that it was complying with the requirements of the V-Loan Guarantee Agreement and the Loan Agreement. It was satisfied that it was acting properly and that it was following the instructions it had received. It did not sign the V-Loan I

Guarantee Agreement until it was satisfied that 85 percent of all funds advanced pursuant to V-Loan I would be guaranteed should Dri-Mix not complete the contract or satisfy its outstanding loans.[11]

On April 5, 1977, the parties formally signed the V-Loan Guarantee Agreement and the Loan Agreement.

### Administration of the V-Loan I Guarantee Agreement

Pursuant to the requirements of V-Loan I, Merchants forwarded the collateral representation certificate used to justify each advance under the agreement. Branscomb of the Fed, acting as fiscal agent for the DLA, reviewed each certified statement for accuracy and to assure compliance with the conditions of the V-Loan. Branscomb discovered deficiencies only in the first group of certificates submitted. He notified Patrick of the deficiencies and the certified statements were promptly corrected and resubmitted. Branscomb did not discover a single problem with any other collateral representation. Defendant suggested at trial that the form devised for making the collateral representation was insufficient to permit an accurate computation of the asset formula. Any deficiencies in this form (and the record does not support a finding of any deficiencies) are chargeable to defendant because the DLA did not supply any instructions for the collateral representation. Moreover, DLA's fiscal agent par-

---

10. The V-Loan application stated that the guaranteed funds would be used for working capital. DLA officials knew that the MCI contract was labor intensive in nature, and they anticipated that a substantial portion of the loan guarantee would go towards the payment of wages and salaries. In fact, paragraph 6 of the loan agreement supplied by the Government, expressly includes wages and salaries as working capital. Moreover, the V-Loan Guarantee Agreement and the Loan Agreement do not distinguish between direct and indirect labor costs in applying the asset formula. Both direct and indirect labor costs could be included as working capital for the purposes of determining collateral under the asset formula. Thus, Branscomb properly interpreted the scope of the V-Loan I guarantee and his interpretation was in accord with that of the DLA.

11. Pursuant to paragraph 4 of the V-Loan Guarantee Agreement, the financing institution was just that, and was not responsible for maintaining Dri-Mix's records, nor for maintaining a daily presence at Dri-Mix facilities. Nor was the Bank required to take over management decisions from Dri-Mix, as defendant has argued. The V-Loan contemplates a division of responsibility between the financing institution and the borrower. Pursuant to paragraph 13 of the V-Loan Guarantee Agreement, Merchants was entitled to be reimbursed unless it was *grossly negligent.* This guarantee was made by the Government and is consistent with the overall purpose of the V-Loan program. i.e., to assure that banks will be reimbursed if they make credit available to needed defense contractors.

ticipated in the development of the form and approved the computations contained therein as being sufficient to justify all of the Bank's advances.

Defendant also argued at trial that duplicate collateral was used to justify advances under V-Loan I. But no evidence of the use of duplicate collateral in computing the asset formula was produced at trial. Overall, Merchants administered V-Loan I properly and was not negligent in its administration of the agreement. *A fortiori*, it was certainly not "grossly negligent" (quoting the agreement) in discharging its responsibilities under the agreement.

### Modification of the V-Loan I Agreement

Despite the difficulties caused by the late and unbalanced delivery of GFM, Dri-Mix was finally able to begin MCI production under V-Loan I. The rate of production was relatively low, however, for the reasons earlier described. The volume of materials stored at Dri-Mix facilities was enormous. By this point, Dri-Mix had received nearly 100 percent of the GFM, consisting of approximately $45–50 million worth of foodstuffs. As a consequence of the sheer magnitude of the inventory of components on hand, as well as the uneven shipments of the various components, Dri-Mix could not begin to organize its assembly line operations as originally planned. There was no opportunity to move components where they were needed, if those components were in another warehouse, without totally rewarehousing trainloads and truckloads of material.

Dri-Mix approached Merchants for additional financing because of the continuing effects of the delay and disruption caused by the Government's failure to properly time and coordinate the delivery of GFM. Merchant's potential exposure on the two guarantee contracts, plus the required $200,000 line of unguaranteed credit, was $410,000.[12] This amount was within the

Bank's $500,000 limit. Patrick refused to take any further risk without further Government support. He proposed an increase in the unguaranteed line of credit from $200,000 to $300,000 if DLA would increase the guaranteed portion of the V-Loan to 85 percent of $1,600,000. This was a package offer by Merchants. The Bank would not have lent additional money on the MCI-related contracts without the acceptance of the package. DLA agreed and on May 20, 1977, the parties entered into an agreement modifying the terms of V-Loan I. The modification raised the guarantee to 85 percent of $1,600,000, at 10 percent interest, and the unguaranteed line of credit to $300,000.

By July 19, 1977, the total amount of credit extended to Dri-Mix by Merchants pursuant to V-Loan I had reached $1,800,-000. All but $16,000 of that $1,600,000 V-Loan had been loaned by Merchants to Dri-Mix.

### Revocation of V-Loan I on the Grounds of Invalidity

Dri-Mix assembled MCIs at one-third of the rate it anticipated during the months of May and June. Its slow and inefficient rate of production, for the reasons earlier described, prevented it from producing MCIs profitably. The factors contributing to unprofitable production were the tardy and unbalanced delivery of GFM. This resulted in overcrowded warehouses, additional warehouses, the inability to set up assembly lines as planned, demurrage charges, extra and nonproductive labor expenses, and extra equipment expenses. Consequently, the cost of manufacturing each MCI exceeded the amount Dri-Mix could reasonably have anticipated when it bid on the contract.

On June 20, 1977, Robert Ray, CPA, and Jim Brown of the Defense Contract Audit Agency (DCAA) were ordered to determine whether Dri-Mix was financially capable of

---

12. This figure represents the unguaranteed 15 percent of the $1,400,000 V-Loan and the additional $200,000 line of unguaranteed revolving credit that Merchants was required to extend under the terms of V-Loan I. The unguaranteed line of credit was not restricted to the two guaranteed contracts.

completing the contract.[13] The audit was given an unusual priority or rush status. No explanation could be adduced at trial as to why the financial report was suddenly ordered without regard to the Dri-Mix claim for breach or to the prior circumstances which had crippled production and produced a financial crisis. Messrs. Ray and Brown arrived in Mobile on June 21, and they started their audit that day. The audit took several days to complete. Ray's report was completed and released by his supervisor on July 8, 1977.[14]

The audit report concluded that it would be difficult for Dri-Mix to complete the MCI contract and repay the Government-insured loan. The report did not concern itself with the reasons underlying these difficulties, nor with the effect on that conclusion if the Government's liability on the Dri-Mix claim were acknowledged, as it eventually was. The conclusion was based on several factors. First, Dri-Mix had exhausted nearly all of its credit, having spent $1,800,000 of the total of the $1,900,-000 guaranteed under V-Loan I and the Bank's supplementary unguaranteed line of credit. Second, the auditors had developed a subjective impression that creditors were "banging down the door" trying to get paid. Third, Dri-Mix would have to boost production levels dramatically in order to replenish its working capital. Here again there was apparently no interest by these auditors in the reasons why production levels were low. Fourth, Dri-Mix's net worth had declined from a positive net worth of $10,950 on December 31, 1976, to a negative net worth of $573,154 on March 31, 1977. Fifth, Dri-Mix had 3 cents in liquid assets to pay for every dollar it owed. Sixth, it was the auditor's opinion

that the Dri-Mix accounting system was inadequate.

During that same period (June-July 1977), Karl Kabeiseman, General Counsel of the DLA, for the first time began to raise questions about DLA's authority to enter into guaranteed V-Loans. According to Kabeiseman, he was reading a memorandum from the General Counsel's office of the Department of Defense that discussed V-Loans, among other things. The memorandum was addressed to someone else and stated that there was no authority to grant V-Loans because of an amendment to the Defense Production Act of 1975. Section 2 of that Act amended the Defense Production Act of 1950 as follows:

> The first sentence of section 717(a) of the Defense Production Act of 1950 is amended by striking out "November 30, 1975" and inserting in lieu thereof "September 30, 1977: *Provided,* That all authority hereby or hereafter extended under title III of this Act shall be effective for any fiscal year only to such extent or in such amounts as are provided in advance in appropriation Acts".[15]

Kabeiseman testified that he was generally aware that an Assistant General Counsel in his office, Tom Hillin, had been working with the Comptroller's Office on a V-Loan.[16] Kabeiseman testified that he did not consider the memorandum he had seen to be dispositive and asked Hillin to reexamine the issue raised therein.

Hillin conducted additional research and concluded that his initial interpretation was valid, namely, that DLA had authority to enter into V-Loan I. The critical issue was whether the appropriated stock fund met the requirement for an appropriation "in advance", or whether a separate appropriation had to be earmarked for V-Loans, even

---

**13.** The DCAA is responsible for auditing contractors working on Defense Department and NASA contracts.

**14.** The audit report was initially sent to the Commander of the Defense Contract Administration Services in Birmingham, another field agency under DLA.

**15.** Defense Production Act Amendments of 1975, Pub.L. No. 94–152, § 2, 89 Stat. 810 (1975).

**16.** The testimony established that an Assistant General Counsel functioned independently in the areas assigned to him and with the "clients" in his area of expertise. Hillin was charged with counseling financial matters and was counsel to the DLA Comptroller.

though it might never be needed to support a guarantee on a defaulted loan. The issue is one of statutory construction. Prior to 1975, there had been no requirement for an appropriation "in advance". The concern of the author of the memorandum was that by inserting language specifically calling for an appropriation "in advance", Congress might have meant to require specific appropriations to cover any contingent liability before V-Loan guarantees could be issued.

The stock fund, it should be explained, is a fund appropriated by Congress for all of the military departments for general procurement purposes. These funds are transferred to DLA for the purchase of items common to more than one military service, such as MCIs. Hillin, after conducting his additional research, concluded that the stock fund was appropriated by Congress "in advance" of expenditures. Therefore, a separate appropriation for V-Loans would not be necessary. If a contract were performed as anticipated, it would be paid for out of the appropriated stock fund and there would be no need to separately fund the guarantee. This conclusion was the same interpretation that he had reached when he conducted his initial research on V-Loans.

Hillin reported his conclusions to Kabeiseman. Kabeiseman, dissatisfied with this conclusion, had Hillin examine the issue once again. In addition, Kabeiseman assigned a summer law clerk to examine the appropriations question. The law clerk also concluded that the stock fund fulfilled the requirement for an appropriation "in advance" and that a specific earmark was not necessary. Thereafter, Kabeiseman and Hillin had several extensive discussions of the issue. Neither attorney changed his mind. Kabeiseman decided that a separate earmark was required for DLA to have authority to enter into a V-Loan guarantee. He consulted with several Department of Defense (DOD) officials before reaching that conclusion. Kabeiseman decided that DLA did not have authority to enter into a V-Loan guarantee because Congress had not specifically appropriated money for V-Loan guarantees. Thus, he changed DLA's interpretation of the relevant statute after the fact, and long after the parties had proceeded in reliance upon the original interpretation.

Assuming Kabeiseman's interpretation on this issue to be correct, the V-Loan chaos which followed this reversal could have been prevented were it not for an egregious oversight or dereliction in implementing the pertinent regulations consistent with that interpretation. The earlier-mentioned Mr. Tovar, Contract Finance Officer who had worked closely on V-Loan I with Assistant General Counsel Hillin, was also DLA's representative on the DOD Contract Finance Committee, beginning in 1975 and throughout the period of these V-Loans. The DOD Contract Finance Committee was responsible for writing and updating the then applicable Armed Services Procurement Regulations (ASPR), including Appendix E. Tovar testified that although he was responsible for drafting regulations governing this area, he did not know that the Defense Production Act of 1975, extending the DPA of 1950, had amended the latter. He had never read the 1975 Act. Moreover, Tovar testified that so far as he knew, no one else on the Contract Finance Committee had ever read the 1975 Act, or if anyone had, he had not pointed out the proviso at the Contract Finance Committee meetings so as to require an update of Appendix E of the ASPR.

After Kabeiseman's overruling of Hillin's interpretation, he met with the Director of the DLA to discuss what action should be taken regarding V-Loan I. Kabeiseman informed the Director that he thought Merchants should be informed at once "because it would be improper to wait until *an eventual default*" (emphasis supplied).[17] The Director of DLA, however, was more concerned about a continuation of MCI production. At that time, DLA

17. Transcript 735–736.

reported a deficiency of over 1 million MCIs, and the Director wanted maximum production in the shortest period of time.[18] Consequently, the Director was concerned that telling Merchants would result in the Bank's stopping credit and Dri-Mix stopping production. Kabeiseman persuaded the Director to let him inform Merchants that there had been no authority to enter into V-Loan I and that the V-Loan was therefore void. There was, however, a clear understanding that the Director wanted Dri-Mix to continue MCI production.

On July 18 and 19, 1977, Kabeiseman held several meetings with other Government employees working on the Dri-Mix contracts. The attendees at these meetings discussed the various problems plaguing the contracts, including: V-Loan I, production, DLA's need for MCIs, and potential claims against the Government by Dri-Mix for late and unbalanced delivery of the GFM components. Tovar's report summarizes the discussions during the last of these meetings in Birmingham, Alabama, as follows:

4. On 19 July 1977 Mr. Kahieseman [sic] reconvened the meeting and outlined the key matters to be discussed. He advised that DLA had a critical requirement for 1,700,000 cases [of MCIs]. He advised that to meet this requirement, DLA could reduce their present stock levels by 850,000 units plus utilize 366,000 cases delivered under the current contract. He advised that the main issue is how can we assure production by Dri-Mix of the 1,700,000 cases. A discussion followed concerning what technical assistance the Government could provide the contractor, quality problems which were being experienced, and the financing arrangements. It was the consensus of all present that the technical assistance being provided by the Government was adequate. DPSC was given an action item to look into the quality surveillance being provided at Dri-Mix. It was mutually agreed that the personnel [Government] presently on site *were not very experienced in inspecting this type of contract.* It was agreed, if possible, that personnel on site should be upgraded and should be given the latitude to make judgments on minor defects. Furthermore, there was a feeling that it might be beneficial to have someone on site who had the authority to waive requirements. DPSC was requested by Mr. Kahieseman [sic] to pursue this matter further. With regard to the financing, all personnel present agreed that the contractor needed financing in order to continue with the current contract *as well as any future contract that may be awarded.* After much discussion and description of the contractor's financial position, it was agreed that the Merchants National Bank of Mobile should be advised that the V-loan was no longer valid, that this fact could not be withheld from them. *Since the V-loan was no longer valid, this meant that the bank now would have an exposure of $1,900,000 in loans to Dri-Mix Products.* Mr. Kabieseman [sic] had the group discuss the alternatives that were open to the Government. Based on the fact that the processing of Public Law 85–804 claims normally took six months, he did not see any relief from this avenue. *In the event that the contractor was forced to cease production due to bankruptcy and withdrawal of bank financing, it appeared that the Government faced a $6,000,000 potential loss.* This was developed by considering a 10% loss of the Government furnished material on site through transportation, damages, and other handling damages. *The value of GFM was $35,000,000* and it was agreed that 10% or $3.5 million would be the loss. In order to store the material while arrangements were being made to reship it, $300,000 would be the expense. *Further, as a worse [sic] case, the contractor would have a claim which could be*

---

**18.** The time involved in terminating the Dri-Mix contracts, and re-letting them, would have been both substantial and costly. At this point, Dri-Mix could supply MCIs faster than any other source.

*as high as $1,900,000.* A second alternative was discussed and that was to allow the contractor to produce the 1,700,000 units and for the Government to encourage the bank to stay with the contractor. In order *to entice* the bank to stay with the contractor, it was deemed appropriate *to mention that a follow-on contract was being considered for Dri-Mix Products; that the contractor could develop a claim against the Government for delays in shipping components to him; and that the production efficiency of the contractor was improving so that a reduction in the amount now loaned would result.* After much discussion, it was agreed that the best approach was for Mr. Kabieseman [sic] and Mr. Tovar to meet at the bank and discuss the guaranteed loan program with bank personnel. They would set up a follow-on meeting which would be attended by the remaining personnel at a later time during the day. [Emphasis supplied.] [19]

The DLA's strategy thereafter was essentially as outlined in the foregoing report. Kabeiseman would inform Merchants that V-Loan I was void, but would do so in a manner to assure that Merchants would continue to finance Dri-Mix's MCI production.

On the following day, July 20, 1977, Kabeiseman called a meeting with Dri-Mix, Merchants, and the Fed, in Mobile. Messrs. Kanehl for Dri-Mix; Lamar, Hannan, and Myers for Merchants; Branscomb for the Fed; and Kabeiseman and Tovar for the DLA attended that meeting. The parties other than DLA were given only a few hours' notice of the meeting and except for the DLA representatives, no one knew the purpose of the meeting. The only hint of trouble was that Merchants was told to bring its attorney.

At the meeting, Kabeiseman told the parties that V-Loan I was void. The Bank officials were in shock. With that announcement, Merchants' unguaranteed exposure rose from about $440,000 to $1,800,-000 in a matter of seconds, almost touching the Bank's legal loan limit.

The meeting was carefully planned. Immediately after announcing the bad news, Kabeiseman developed DLA's plan to persuade Merchants to continue financing Dri-Mix. He emphasized that the problem was merely technical and although he was embarrassed that his agency could have let this happen, he explained that the problem could be solved with teamwork. Teamwork was emphasized throughout the meeting by Kabeiseman. He explained that without a specific appropriation addressed to V-Loans, the DLA did not have authority to enter into V-Loan agreements. He explained that this problem could be solved by an amendment to the Defense Appropriations Act which was being considered by Congress at that very moment. Kabeiseman then produced a sheet of paper which contained the language for the necessary amendment. He explained that time was of the essence because if the fiscal year 1978 Defense Appropriations Act was to contain specific appropriations for V-Loans, action had to be taken now. Kabeiseman told Bank and Dri-Mix representatives to contact their local Congressman or Senators at once urging them to introduce the necessary legislation.

Merchants officials once again advised Kabeiseman that they would never have extended that amount of credit without a loan guarantee. Kabeiseman promised to do everything he could to help Merchants extricate itself from this position. He promised to support the legislative amendment he had drafted. An additional meeting was held later that day to discuss Dri-Mix's production problems and what could be done to help Dri-Mix solve these problems.

The above-quoted plan developed by DLA on July 19, 1977 to "entice" Merchants to continue financing Dri-Mix was successful. At the close of the meeting, the Bank's representatives felt confident that the DLA was trying to make things

---

**19.** Tovar report of the meeting of DLA officials on July 19, 1977.

right. They accepted the DLA's explanation that the problem with V-Loan I was a mere technicality and that this problem would be solved by passage of the amendment that Kabeiseman had provided. Moreover, Kabeiseman and Tovar said that the only limitation on a new V-Loan agreement would be in the applicable regulations.

The scenario described by the DLA representatives, provided the Bank continued to finance Dri-Mix, was far preferable to the unmentioned alternative, namely, a Dri-Mix bankruptcy. If that occurred, Merchants would have been left with at least $1,800,000 of Dri-Mix indebtedness. At that point, Dri-Mix could have paid only 3 cents on the dollar to its outstanding creditors, plus whatever a trustee in bankruptcy might have recovered for the benefit of all creditors, on Dri-Mix's claims against DLA for breaching the terms of the MCI contract. Additionally, the Bank officials felt a patriotic duty to help the military fill its "urgent" need for MCIs, a need which the Bank officials were told could not readily be met elsewhere.

In any event, the primary reason why Merchants elected to continue financing Dri-Mix was because of the assistance and support offered by DLA at the fateful meeting of July 20, 1977. At that time, neither Dri-Mix nor Merchants anticipated that there would be any problem obtaining a new V-Loan, because they were told by the DLA that the only problem was a technical and legislative one. While no express guarantee that a new loan would be issued was given by the DLA officials, Merchants was advised that the only limit on a new V-Loan once the proposed amendment became law would be the applicable regulations.

At trial, Tovar and Kabeiseman testified that something must have been said at the July 20, 1977 meeting about alleged deficiencies in the administration of V-Loan I.[20] However, no one else remembers any such accusation, warning, or suggestion, not even Branscomb of the Fed, who was DLA's fiscal agent. Additionally, there is no mention of any such problem in Kabeiseman's notes of the meeting. It is apparent that nothing was said concerning alleged deficiencies in administration at that meeting. DLA officials were at that time anxious to ensure continuing MCI production and to "entice" Merchants to continue to finance Dri-Mix and its MCI production. DLA succeeded and the Bank agreed to continue the financing arrangement.

### The Period Between the V-Loan I and V-Loan II Guarantee Agreements

There is no dispute that Merchants continued to fund Dri-Mix following the July 20, 1977 meeting. On that same day, Bank officials contacted Congressman Jack Edwards to have him sponsor the necessary amendment to the Defense Appropriations Act. Merchants also continued to provide the Fed with certifications in accordance with the asset formula and the V–Loan I agreements, reporting each advance until Bank officials reached what they believed to be their legal lending limit.[21]

Public Law 95–111 was enacted on September 21, 1977. The Act provided, in part, for an appropriation of $5 million to DOD, specifically earmarked for V–Loans. It was generally understood that the $5 million appropriation was established specifically to permit DLA to fund Dri-Mix. Kabeiseman had anticipated that Dri-Mix would require between $2 million and $3 million to complete the two guaranteed contracts.

By this time, however, DLA officials were no longer very supportive of the pre-

---

**20.** None of the later allegations of mismanagement were proven. As earlier explained, Merchants took great pains to insure that it was administering V-Loan I properly, and the record demonstrates that its administration of the loan program was in order.

**21.** In the view of the Bank's attorney, that lending limit was never reached. However, under another interpretation of general banking regulations, Dri-Mix could be regarded as having been permitted to overdraw its checking account in an amount not significant in light of the amounts involved in this case.

viously described plan to issue another V-Loan. As indicated in correspondence with the Fed, between September 20 and 23, 1977, DLA personnel reported a degree of "uncertainty" as to the direction to be taken with the V-Loan, even if the legislation was signed into law. This change in attitude understandably surprised Branscomb of the Fed, given the impression DLA officials had conveyed to him, Dri-Mix, and Merchants at the July 20, 1977 meeting.

Neither Merchants nor Dri-Mix officials were notified of this shift in attitude on the part of the DLA. Merchants continued to finance Dri-Mix's MCI production. A meeting was held on October 21, 1977 between Dri-Mix and DOD representatives to discuss continuing production problems. Merchants officials told DLA officials that Dri-Mix needed more financing for the two guaranteed contracts. At this meeting, Tovar requested additional financial information from Dri-Mix and told the Bank to submit an application for a new V-Loan. No one with DLA or DOD mentioned that there might be any problems in issuing a new V-Loan or that DLA had any questions about the Bank's computation of the asset formula in making advances thereunder.

*Negotiation of the V-Loan II Agreement*

On November 1, 1977, Merchants submitted an application for a new V-Loan (V-Loan II) in the amount of 85 percent of $2,600,000, at 10 percent interest. The amount requested in the loan application was consistent with the understandings conveyed by DLA officials at the July 20, 1977 meeting and with DLA's estimate of requirements. In the application, the Bank stated that both guaranteed contracts were approximately 42 percent complete and that "[a]lthough the applicant [Dri-Mix] has incurred unexpected difficulties in the performance of these contracts [due to the manner and timing of the GFM deliveries], we [Merchants] feel that they [Dri-Mix] have the ability to complete the contracts on the amended schedule and to remain a viable organization fully capable of performing on future contracts."

On November 10, 1977, DLA requested detailed financial information from the Bank and Dri-Mix, and yet another agency within DOD, the Defense Contract Audit Agency (DCAA), was requested to look into certain aspects of Dri-Mix's operations. Specifically, Dri-Mix and the Bank were asked to provide information concerning costs incurred under the two guaranteed contracts, costs incurred by Dri-Mix as a whole, the sources of receipts and funds, schedules showing accounts and notes payable, leases and mortgages, accounts and notes receivable, Dri-Mix's latest audited and unaudited financial statements, a monthly cash forecast, and estimated profit and loss summaries. In addition, DCAA requested permission to review Dri-Mix's overall records and accounting system in order to develop information concerning the costs incurred by Dri-Mix on the two guaranteed contracts, the use of V-Loan I advances, and the financial viability of Dri-Mix.

Even Tovar realized that Dri-Mix would be unable to furnish all the information requested due to time constraints, Dri-Mix's pressing need for financial assistance, and perceived inadequacies in the Dri-Mix accounting system. Tovar indicated to Dri-Mix officials at the outset that if they were unable to furnish the requested information within the time required, DLA planned to compromise on the information required by DCAA.

Dri-Mix responded to this request for information on November 18, 1977 and supplied much of the required information. Dri-Mix officials believed that the information supplied was accurate and that it would withstand review in a subsequent audit by DCAA. The DLA never contacted Dri-Mix after receiving this information to discuss it or to express any misgivings regarding any alleged mishandling of V-Loan I.

As indicated in the information supplied by Dri-Mix, the only contract in production, other than the two guaranteed contracts, during the October 1977 to January 1978 period was the closely related accessory

bag contract earlier mentioned. Virtually all other costs during this period were associated with the two guaranteed contracts. All costs during that period were related to MCI production. Moreover, in the 12-month period ending September 30, 1977, Dri-Mix had lost $1,719,400.[22] Eighty-four percent of this loss was directly related to the MCI contracts. Additionally, the problems with the MCI assembly contract stemming from late and uneven delivery of GFM had overwhelmed Dri-Mix and had certainly prevented it from completing its non-MCI contracts profitably.

Tovar had received an audit report from DCAA in response to an earlier request. The report, dated November 8, 1977, was prepared by Robert Ray. The audit did not contradict the information supplied by Dri-Mix. It stated rather that Dri-Mix had not corrected deficiencies previously found in Dri-Mix's accounting system and that these deficiencies precluded an accurate allocation of costs on a contract by contract basis. Nevertheless, Tovar believed that the information submitted by Dri-Mix on November 18, 1977 distorted Dri-Mix's actual experience. Specifically, Tovar believed that common costs allocated to the MCI contracts should have been spread over all other contracts. Tovar did not, however, contact Dri-Mix about the questions that he harbored. Instead, he developed his own analysis based on his own speculative criteria. At no time did Tovar discuss these criteria with Dri-Mix. In his speculative analysis, he reallocated costs away from the MCI-related contracts until it appeared to him that during the 12 months ending September 30, 1977, Dri-Mix had lost merely $500,000 on the two guaranteed contracts. His analysis was based on his own speculation and not on facts.[23]

Tovar testified regarding his methodology that his sole criterion for reallocating costs was that it did not seem logical to

him that all those costs could be attributable to the two guaranteed contracts. But he also testified that if all those common costs resulted from the late and unbalanced delivery of GFM for the MCI contract, Dri-Mix's allocation would make sense.

In fact, many of the costs considered by Tovar to be common to all contracts were solely and directly related to the two guaranteed contracts. For example, the need for extra warehouse space was due solely to the way GFM was being supplied in breach of the original contract.[24] Moreover, during the period of performance of the MCI contract, there is no doubt that Dri-Mix's management had to spend an overwhelming proportion of management time on the MCI contract.

Tovar's analysis further erred in allocating common costs based on *revenue generated*. The MCI contracts were in operation throughout most of the fiscal year ending September 30, 1977. It is essential to remember that the primary problem with the GFM deliveries was that they prevented Dri-Mix *from producing* and, therefore, from *generating any revenue*. The MCI contract was an assembly line contract for assembly of an enormous number of MCIs. Everything was based on timing. Thus, an analysis allocating common costs based on revenue earned from all Dri-Mix operations was deceptive because throughout this period Dri-Mix was forced to spend considerable sums of money on the MCI contract, without corresponding production. The so-called "common costs" associated with the MCI contracts were unique to those contracts and they were attributable to the fact that Dri-Mix was compelled to work around DLA's ability to properly coordinate delivery of GFM. Thus, Tovar's "analysis" is both speculative and inaccurate.

22. Note that this approximates the sum for which Dri-Mix's trustee in bankruptcy later settled the Dri-Mix claim against DLA for late and unbalanced delivery of the Government-furnished components.

23. Although Tovar's testimony would suggest that no costs were allocated to other contracts, the record is to the contrary.

24. The same was true of freight, demurrage, interest and associated labor charges.

A November 14, 1979 report of one Ronald McGovern, a CPA later retained by the trustee in bankruptcy, indicates that the total increased cost caused by the Government's breach on the two guaranteed contracts, exceeded $4 million and that Dri-Mix's books were accurate enough to make a detailed determination and allocation of such costs to each MCI-related contract. Tovar conceded at trial that this information had been available during the November 1977 period, if someone had been willing to put in the time necessary to ascertain those figures. The McGovern report confirms Dri-Mix's representations and not Tovar's speculations which find no basis in the record.

On November 29, 1977, a meeting was scheduled to negotiate V-Loan II. The following DLA talking paper was prepared for use by DLA officials at this meeting:

## TALKING PAPER

SUBJECT: Dri-Mix Products, Inc.

*The Company.* Dri-Mix Products, Inc., a designated small business firm normally employing between 20 and 50 persons, is located in Mobile, Alabama, a large unemployment area. The company, organized in 1970 with paid in capital of $37,500, manufacturers [sic] and packages cocoa beverage powder. Sales are made to the Federal Government (DLA) and to wholesalers and institutions. The firm currently has a $5.2 million MCI contract with DLA for 2.9 million cases. Historically, the company experiences a very large debt in relation to its capital. Part of the large debt is due to the purchase of two company aircraft. The company has at least two debts amounting to $288,000 with DLA and potential for several claims by DLA in connection with the MCI and other contracts.

*The Problem.* The Contractor is unable to perform satisfactorily on the MCI contract. The delivery schedule has been revised twice and needs to be revised again. To date the Contractor, DCAS or DPSC have [sic] not been able to predict production rates. Several problems, precluding satisfactory production, have been identified and discussed in meetings between DLA and the Contractor as follows:

a. *Managerial.* The Contractor has been unable to identify or anticipate problems. When problems have been identified, the magnitude has not been estimated correctly. In this respect DLA has not been successful in helping the Contractor. Essentially, all the problems relate to this basic problem.

b. *Equipment.* Originally the Contractor structured his plans and anticipated profit based on heavy utilization of automated processes. The equipment he acquired has not functioned as predicted. In some instances, the failure of the equipment to function properly was resolved by lowering contract specifications. For example, the boxes were not glued to specification so the contract requirements were lowered. In some cases manual intervention was used to compensate for equipment not operating at specified levels. For example, the equipment kept jamming with boxes for an extended period of time. The Contractor identified this problem as equipment failure. Finally, the equipment manufacturer convinced the Contractor the problem was due to warped boxes. These boxes were warped due to the manner in which they were stored and the humidity in the storage facility.

c. *Labor.* The Contractor is experiencing a labor turn over rate of 20% per month, is paying the minimum wage and has experienced at least one strike for higher wages. The Contractor has not been able to shift personnel to compensate for equipment failure or other production problems.

d. *Inventory.* The Contractor received a large volume of GFM during a short period of time. The Contractor was not prepared for the receipt of such volume. Consequently, the material was stored improperly, i.e., too high, in a disorganized manner and in uneconomical and inadequate storage facilities. These storage practices impacted on component parts, production capability and condition of the

GFM. Due to the close and high stacking of GFM components, damage to components has been incurred. This will result in MCI component shortages before the contract is completed. The close, unrecorded and disorganized manner of storing components restricts production because the components are not easily located or mechanically manipulated. The inadequate storage facilities have contributed to rust on some of the components.

e. *Delay of GFM. The DPSC was unable to appropriately coordinate the Procurement of the GFM and delivery to the Contractor.* [Emphasis supplied.] Consequently, the Contractor was delayed for approximately four months. Additionally, the GFM was delivered in a very short period of time and this created considerable difficulties for the Contractor. See paragraph d.

f. *Communication with DLA.* The Contractor alleges that a major reason for his production problem has been his inability to secure quick managerial responses from DLA. He states that he has been dealing with *"several pockets of interest"* [emphasis supplied] and this has constrained him severely in solving problems expeditiously. For this reason, he blames DLA for many of the production problems.

g. *Financial.* The Contractor does not have an adequate financial information system to determine cost incurred or adequate cash management information at the contract level. For example, the Contractor maintains that his cash requirements are satisfied by a production of 300 pallets per day (at 48 boxes per pallet = 14,400 cases per day). However, there is no information to prove or disprove allegation. The firm is financed by a credit line furnished by the Merchants National Bank of Mobile, Alabama. Currently, that credit line is at 1.9 million dollars and apparently has been over drafted since 17 October 1977. The bank maintains that their limit for financing a single account is $2 million and consequently, they are illegally over committed. *Southern Packaging and Storage Co. has protested a new award ($1.97 million for*

*1.4 million cases) made to Dri-Mix for a portion of next year's MCI buy.* [Emphasis supplied.]

*Future Production.* Mr. Kanehl, President of Dri-Mix Products, Inc. estimates production at 320 pallets or 15,360 cases per day. This production considers the outside variables that influence the firm's environment. These variables are all the problems listed above. None of these problems have [sic] been completely resolved and in some cases not completely defined. An example of a partially defined problem is the rust problem. Although DPSC maintains the rust has been completely defined and resolved, the Contractor believes there may be rust in other components. DPSC only dealt with rust on fruit cans. The Contractor believes that rust existed upon delivery to Dri-Mix. For this reason Dri-Mix is reevaluating that problem.

*Contractor's Request.* The Contractor has requested that DLA guarantee his loan with Merchants National Bank of Mobile, Alabama. He is in process of preparing an application specifying amounts and agreement terms. The bank is encouraging Dri-Mix Products, Inc. to request the Guarantee Loan. The bank's motivation is over exposure. The bank's legal limit per account is $2 million. This limit apparently has been exceeded due to over drafts. The current authorized line of credit of $1.9 million has been fully utilized. The bank alleges inability to finance Dri-Mix further. To the extent DLA guarantees a loan, the bank's exposure is reduced. This is legally and financially desirable for the bank. *The bank contends that DLA is responsible for their over exposure because DLA erroneously issued a $1.6 million guaranteed loan and then voided it.* [Emphasis supplied.]

*DPSC and DLA–P Position.* The Contractor should be assisted as necessary to continue production for the following reasons:

a. *Second Source for MCIs. Southern Packaging and Storage Co. is a sole source for MCIs. Dri-Mix has already caused Southern Packaging to reduce the MCI price.* [Emphasis supplied.] A new

source is advantageous to the Agency. However, during the loan agreement approval procedures, the PCO identified Sanna Division of Beatrice Foods and Maple Island Inc. as alternate sources.

b. *Production of Acceptable MCIs.* Although the Contractor is not producing at a satisfactory rate, the Government has accepted 1.4 million cases of MCIs.

c. *MCI Need.* The readiness posture of the Military Services for this item is severely deteriorated due to the delay in awarding contracts for the MCI and because of the slippage in delivery schedules. Issues of this item are made on a continuous basis to effect rotation and support Service training exercises. The suspension from issue of deteriorated MCIs (prior * * * procurements) has further added to the readiness problem of the Military Services. It is necessary that DLA receive MCIs sufficient to meet its demands.

d. *Financially Advantageous Not to Default the Contractor.* If the Contractor were defaulted the following costs would be incurred by DLA:

(1) *Supply Failure.* DLA would be unable to fill all MCI requirements placed by the services.

(2) *Loss of GFM.* There is approximately $23 million of GFM in the Contractor's plant. Assuming a 10% loss, a $2.3 million loss would result.

(3) *Storage Costs.* Approximately $300,-000 would be incurred to segregate, count, move and store the GFM.

(4) *Claims by the Contractor. The Contractor would probably be successful in his claims against DLA. A conservative estimate by DCASR Atlanta is between $.5 million and $1.0 million.* [Emphasis supplied.]

(5) *Reprocurement.* As indicated above, it is necessary to reprocure the items. Since DPI is not able to pay the reprocurement costs, DLA would be faced with an estimated reprocurement cost of $2.2 million (1.5 million cases at an estimated unit cost of $1.47). *In addition, there is a reasonable chance that the termination*

*for default would be converted to a termination for convenience. If this occurred, in addition to the above, the Government could be responsible for up to the contract price in damages to DPI* [Dri-Mix]. [Emphasis supplied.]

*The cost to DLA for defaulting the Contractor is approximately $5.8 million. Consequently, it would be advantageous to assist this Contractor to complete the contract.* [Emphasis supplied.]

*DLA–C Position.* The Comptroller is not prepared to approve or disapprove the Contractor's request for financial assistance until the details of his request are submitted. However, there are concerns as follows:

a. It appears the Contractor may not need additional financing. The Contractor indicates that his cash requirements are satisfied by delivering an average of 14,000 cases (300 pallets) per day. His conservative production estimate is 15,360 cases (320 pallets) per day. Both DCASR Atlanta and DPSC personnel estimate higher production rates. Consequently, the Contractor should not require additional financing by the bank or DLA. Unfortunately, the Contractor does not maintain an acceptable accounting system to verify the above.

b. The Contractor, and especially the bank, may be attempting to shift risk for their investment to DLA. While this notion may be desirable to the bank and the Contractor, there is no motivitation [sic] for DLA.

c. Guaranteed Loans are for the purpose of providing working capital for specific contracts. The loan must be completely repaid at contract completion. The bank and the Contractor do not appear to view a Guaranteed loan in this restricted manner. Because of the DLA–P and DPSC position, DLA–C, with assistance of DLA–C, will negotiate towards financially assisting the Contractor if there is adequate justification. A risk assessment based upon the factors discussed above which make it financially advantageous not to default the Contractor will be considered in the deter-

mination of whether to assist the Contractor and in arriving at amounts if a favorable determination is made. However, [any] financial assistance and risk to DLA will be minimized to the extent possible through the terms of the loan agreement.

The above-quoted "Talking Paper" acknowledges that many, if not most, of Dri-Mix's production problems were caused by the delays and the timing of GFM deliveries. But it also demonstrates a change in emphasis away from rectification of the V-Loan I debacle, to minimizing DLA's costs regardless of the impact on Merchants and Dri-Mix. The previously described Hillin, Assistant General Counsel who negotiated V-Loan II with Tovar, described the DLA negotiating strategy in his testimony as follows:

> Well, we went to the bank and we went up to their conference room and we negotiated. They—I don't recall exactly how much money they wanted. When I go back to the files it looks like $2.6 million must have—was the amount, and we went in and we negotiated very much like the negotiating in other agreements. They wanted more and then we wanted to negotiate a fair amount. We wanted to make sure—I mean, obviously—first of all, we wanted the loan because essentially the determination was made in advance before we got there that they would have the loan. That decision was made in Cameron Station, basically, that we would go down and negotiate a loan, and our intent was to negotiate a loan. That's number one.
>
> *Number two, we wanted to negotiate a loan that would both protect the Government, but give enough money and give enough protection to the bank to assure that we'd get some sort of continued production under the contract which meant we had to—the bank had to feel comfortable, maybe not, real comfortable, and Dri-Mix had to feel that it got enough money to continue production of the contract.* [Emphasis supplied.]

Regarding the actual negotiations, the substance of Hillin's further testimony was that the Bank wanted a replacement V-Loan guarantee of $2.6 million and that "we obviously couldn't get beyond $5 million. That was—that was the amount that Congress earmarked * * *. Other than that, the only limitation we had was—was—looking back through the memos and stuff, there was some figure of $2 million, but that's—that's sort of a tentative sort of thing. That could go, you know, and we went in and negotiated." When asked to characterize the tenor of the negotiations for V-Loan II, he replied:

> In effect, they were arms-length negotiations, we knew we won the agreement. They knew they needed one. We knew they needed one. * * *

In comparison, Patrick, representing Merchants, testified that it was not until the negotiation of V-Loan II that he was first made aware of any DLA concern with the Bank's administration of V-Loan I. This evidenced a change in attitude which surprised him. DLA's initial offer was to guarantee only $500,000 of the $2 million Merchants then had outstanding, which Patrick characterized as "a ridiculous offer". He described the negotiations as extremely difficult. The Bank officials "felt that the—that Mr. Tovar and his associates were most unreasonable; were really not making any attempt to live up to any of their commitments." The final offer by DLA was a guarantee of 55 percent of the $2 million which the Bank had already extended, "which in effect, was a 1.1 million dollar guarantee." Even this was conditioned further on the Bank's providing an additional unguaranteed $500,000 revolving credit to Dri-Mix. He described the negotiations as involving many trips to Washington, "and it came to the point to where Mr. Tovar gave us a take-it-or-leave-it offer; and that was as far as we were going to go. I mean we hit a blank wall. * * * We left the negotiations feeling that the government agencies, the DLA, had—had succeeded in using their hindsight and whatnot to bail themselves out of a situa-

tion that left the Bank holding the bag, so to speak."

Mr. Hannan, the Bank's attorney at the negotiations, testified that Tovar opened the meeting by commenting that Dri-Mix was producing at a loss. When Hannan replied that he thought they were there to discuss the reissuance of the V-Loan, Tovar turned to Kanehl of Dri-Mix suggesting that he ought to consider just stopping production altogether on this contract and filing a claim. Hannan found this "unbelievably shocking" and a reversal of the purpose of the meeting, namely, reissuance of the V-Loan guarantee.

He also testified with respect to a memorandum prepared by one Louis Zummara, Chief of the Economic Analysis Branch of DLA, indicating that DLA was prepared to guarantee at least $1.5 million, based on an economic analysis of the probability of a default by Dri-Mix.[25]

Hannan felt that DLA's negotiator was "overreaching", was ignoring the thrust of the July 20 meeting at which the main concern had been continuing production of MCIs and prompt legislation authorizing replacement of V-Loan I. When Tovar advised that $1.1 million was as far as he could go "within the regulations", and this was a "final offer" and was "generous", Hannan reluctantly concluded the V-Loan II agreement, recognizing that it was grossly inadequate to support an existing

indebtedness which had already climbed to $2.2 million.[26] But he also was aware that the alternative to that agreement was the immediate bankruptcy of Dri-Mix. The record shows that Merchants accepted the agreement under duress.

### The Demise of Dri-Mix

The V-Loan II agreement was executed on December 9, 1977. In addition to providing for a DLA guarantee of only 55 percent of $2 million for preexisting indebtedness, it was further conditioned upon the Bank's extending an unguaranteed additional $500,000 in the form of a revolving credit line. Furthermore, the $500,000 of unguaranteed credit was subject to an asset formula computation administered in the manner Tovar said should have applied to V-Loan I and not as the Fed, DLA's fiscal agent, had interpreted and applied the asset formula during its administration of that loan.

At this point, the Bank took several steps in order to insure its position in the event that Dri-Mix went bankrupt. For example, the Bank took a second mortgage on Dri-Mix's equipment. It also took special care to apply the asset formula in the manner Tovar was now interpreting it.

Around mid-January 1978, the Bank became concerned about Dri-Mix's ability to meet its payroll because of this application of the asset formula. The mid-January

---

**25.** Plaintiff's Exhibit 91 reads as follows:

"1. Mr. Tovar, DLA–CF, furnished the following information:

"a. Cost to Government if default, $3.6M.

"b. Guaranteed Loan, $1.5M.

"c. Contractor will default if there is no guaranteed loan.

"d. There is some probability that the contractor will still default if the loan is guaranteed.

"2. The probability of the contractor defaulting if a loan was guaranteed was treated as the variable. The break-even probability that could be assigned to the contractor defaulting given the guaranteed loan was computed to be 70%. The following formulation was used in solving the problem:

"Let X be the probability of default if the loan is guaranteed.

$$\text{"\$3.6}\underline{M} * X + \text{\$1.5}\underline{M} * X < \text{\$3.6}\underline{M}$$
$$X < .70$$

"Hence, if it is believed that there is less than a 70% chance that the contractor will default if the loan is guaranteed, then the expected cost to the government is less for guaranteeing the loan.

"3. If it is believed that the probability of default is 40%, then it would require a loan of $5.4M or greater for the expected cost to the government to exceed the cost of not guaranteeing the loan."

**26.** Hillin acknowledged in his testimony that the V-Loan II agreement was "really unfair" and that DLA had a "superior (negotiating) position." Hillin did not think it would settle the matter and end the problem, but would merely postpone it. Tovar testified that he did not know why he stopped at the $1.1 million figure (55 percent of $2 million).

payroll was met, but it became obvious that the February 3, 1978 payroll could not be met because Dri-Mix would reach its credit limit, under Tovar's interpretation of the asset formula, by January 19, 1978. Throughout this period, the Bank kept DLA informed of Dri-Mix's financial situation. Tovar then suggested relaxing the asset formula so as to permit the Bank to lend more money under the Bank's $500,000 unguaranteed line of credit. The Bank rejected this proposal as unacceptable. As Hannan explained:

> The Government has already led us down the primrose path and they want us now just to lend them [unguaranteed] money willy nilly.

About six days before the February 3 payroll was due, the Bank requested an additional V-Loan guarantee to cover that payroll. This was rejected by DLA on February 2 or 3.

The Bank decided that it could not extend any more credit by itself. Because payroll checks were issued by the Bank and signed by its cashier, the Bank refused to issue the checks for fear of creating mass confusion and a run on the Bank. Consequently, Dri-Mix closed its doors on February 3, 1978.

Between December 1977 and February 3, 1978, Dri-Mix had completed production of another 30 percent of the MCIs, bringing total production under the contract up to 70 percent. Dri-Mix's average daily production rate in January had exceeded 15,600 cases per day. Shortages of some Government-furnished components had developed. Moreover, due to corrosion of some components, Dri-Mix would not have been able to produce between 10–15 percent of the MCI units. Thus, even if production had continued, Dri-Mix could have produced only another 15–20 percent of the MCIs called for under the contract. In other words, it was within only 15–20 percent of total possible

production when it was forced to close its doors.

On February 6, 1978, the Bank requested that DLA increase the V-Loan II guarantee by $500,000. Alternatively, the Bank proposed that Tovar's asset formula restriction be waived and that DLA guarantee an additional loan of only $125,000. On February 7, 1978, Dri-Mix submitted a request for extraordinary contractual relief under Public Law 85–804. Dri-Mix requested $3.7 million representing "the out-of-pocket nonrecurring and related costs it will incur because of the excessive costs incurred by the Government-caused delay and disruption in completion of the contract." Additionally, Dri-Mix requested that an immediate $300,000 advance payment on the claim be made to permit the company to continue production pending a decision on its request for extraordinary relief. This request was based on a claim of legal right arising from the contract breaches earlier described. Dri-Mix had meanwhile also been awarded a follow-on contract for production of one-half of the following year's MCI requirements. This contract was also canceled "for default" on February 6, 1984.

The Bank made several attempts to rescue Dri-Mix. On February 8 and 9, 1978, officials from DLA, Merchants and Dri-Mix met to discuss the possibility of additional financing for Dri-Mix and its application for Public Law 85–804 relief, as well as other possible courses of action. DLA ultimately offered to increase the V-Loan II guarantee by $150,000 if the Bank would increase its $500,000 unguaranteed line of credit by a like amount. However, Dri-Mix had closed down and the Bank concluded that this amount would be insufficient to permit Dri-Mix to complete the contract under the circumstances.[27] Accordingly, the Bank rejected the proposal as insufficient. While negotiating, the Bank officials mentioned to the DLA that there was still a large inventory of "GFM there and

---

**27.** Before Dri-Mix had actually shut down, the Bank had been willing to accept this offer. But because of the increased costs of reopening the plant, and restarting production, the Bank estimated that $400,000 to $500,000 would now be

necessary (the Bank was willing to make a 50–50 split of this figure) to complete production. Bank officials felt that without sufficient financing to complete the contract, they would just be throwing more unguaranteed money away.

you don't want it just to deteriorate." At that point they were advised:

Well, it's just not worth very much any more. In fact, if we closed you down—if we closed Dri-Mix down, then *we would just have to bury most of it.* [Emphasis supplied.]

On February 21, 1978, Dri-Mix filed in bankruptcy for reorganization and a reorganization plan was thereafter developed. Pursuant to this plan, the Bank offered to release any claim it had against the Government for V-Loan I in exchange for the GFM still in Dri-Mix's warehouses. Bank officials knew that the GFM still had some value, even though they had been told it was worthless. Bank officials determined that if they financed Dri-Mix's assembly of the remaining GFM into MCIs and these were sold on the open market, the MCIs could bring in $2.4 million. On April 25, 1978, a meeting was held with Deputy Undersecretary of Defense Dale Church to discuss the Dri-Mix reorganization plan. At this meeting, Church charged that the Bank's offer could not have been made in good faith, and he rejected it because the GFM was, in his opinion, worth $5 million. In response to Church's accusation of lack of good faith, the following letter was prepared:

### STATEMENT

On the morning of April 25, 1978, the attached offer of settlement was hand-delivered to the Honorable Dale W. Church at approximately 8:00 a.m. Such letter was a result of conferences between Dri-Mix and the Bank together with their respective attorneys on April 24, 1978, and included what we believe to have been a good faith effort on our part to settle all claims with the Government. At approximately 11:00 a.m., representatives of the Government met with representatives of Dri-Mix and the Bank to reach what we thought would be an accomodation [sic] along the lines suggested in the attached letter. However, from the onset of the meeting, it was obvious that no compromise could be reached.

In response to our letter, Mr. Church stated he felt the offer was being made in bad faith and further that the Government had offered the other parties everything they needed back in February but that the Bank was not willing to go along and, therefore, caused Dri-Mix's current situation. Thus, not only were we discouraged that the Government denied our offer but also the manner in which it was denied so as to place the blame upon the Bank rather than upon those responsible for the predicament—the Defense Logistics Agency.

Regarding the assertion that the offer was made in bad faith, Mr. Church stated that the offer could not have been made in good faith because there were approximately five-million dollars worth of Government furnished material (GFM) which the offer requested to be transferred to Dri-Mix. In point of fact, the GFM has some value, but its value would only be worth $2.4 million to Dri-Mix *assembled* and sold at a "semi-distressed" price. In our February attempts at negotiation with DLA people, when we advised that it was in the Government's best interest to settle the case because of the high probable value of the GFM, Colonel Platt and Admiral Crosby responded that the GFM was not worth very much to the Government and that it had an even shorter shelf-life than originally anticipated. They also privately told some of us that the material would probably be simply junked or buried. However later in March, when Larry Farrell (of the Sellers, Connor & Cuneo firm representing Dri-Mix) discussed possible settlement with D.P.S.C. attorney Russell Borden, Mr. Borden stated he was receptive to discussing a settlement which would include a release of all claims plus Dri-Mix's purchasing the GFM. Accordingly, we utilized all the input we had in order to come up with a *good faith* offer, and Mr. Church's "bad faith" assessment was completely unwarranted.

As to a second point raised by Mr. Church that the fault was with the Bank because it should have financed Dri-Mix through the end of the contract and should have accepted the Government's February offer of an additional $150,000.00 V-Loan Guaranty, that suggestion simply is preposturous [sic]. We responded to this allegation by saying $150,000.00 prior to shut down would have been sufficient but that additional money was needed by the time we met in Washington, D.C. with the DLA. We pointed out the problems of the work force not having been paid and the plant having been shut down for several days and the resulting high probability that many of the Dri-Mix workers would have not returned. (As you recall, we had suggested a last ditch effort to settle on the basis of an additional $150,000.00 guaranty, but this was on Friday, February 3, 1978, before the plant had closed down and before the workers had not received their pay.) As you are aware, after shut down we felt that substantial start-up costs would have resulted from the necessity of training new workers and the decrease in ration production from such business interruption. Thus, the Bank did not accept the $150,000.00 V-Loan extension offer, but we did offer to participate on a 50–50 basis in a greater amount to assure completion of the contract, even though, in effect, some of the advances the Bank would have made would have been unsecured. Based on our projections, we were only asking, in effect, that the DLA reinstate the old withdrawn guaranty in the amount of $1,360,000.00. Mr. Church responded that this argument of "increased start-up costs" was simply false, even though later in our April 24 meeting, he himself characterized the workers as "itinerant."

One final thing of which you may be certain—the Bank would not have gone to the time, trouble, and expense to have gone to Washington on two separate occasions to deal in bad faith. Certainly, our most recent trip resulted in what we thought was a reasonable offer considering the limited shelf life of the goods, moving costs, the seven figured claim Dri-Mix has against the Government, the claim of the Bank against the Government for damages sustained as a result of the withdrawn guaranty, and previous statements made to us by DLA people. We can only assume that Mr. Church had been given less than a full compliment [sic] of facts regarding those contracts.

As a consequence of the denial of Public Law 85–804 relief, and of DLA's further refusal to participate in any reorganization plan, reorganization became impossible. On April 28, 1978, Dri-Mix was adjudicated a bankrupt under Chapter XI. On May 2, 1978, Dri-Mix's remaining contracts, including the MCI and accessory bag contracts, were terminated "for default".

### The Settlement of Dri-Mix's Contract Claims

The trustee in bankruptcy for Dri-Mix made a timely appeal of these terminations "for default" to the Armed Services Board of Contract Appeals (ASBCA). He sought to have the default terminations converted to "terminations for the convenience of the Government". The value of these claims, as evidenced by the previously mentioned McGovern report, was about $4.6 million. DLA filed a counterclaim against Dri-Mix amounting to $5,858,573. After careful review of both claims, it was apparent to all parties that the Dri-Mix claim would be successful and the counterclaim would not be. It is noteworthy that DLA memoranda had indicated as early as the July 20, 1977 meeting and again on November 11, 1977 that DLA officials expected any "default" terminations to be changed to terminations "for convenience" and that DLA's potential liability to Dri-Mix would be between $500,000 and $1.9 million. Negotiations between DLA, the trustee in bankruptcy, the Bank and other Government agencies followed. DLA withdrew its $5.8 million counterclaim and agreed to a gross settle-

ment of $1.7 million with the trustee.[28] Under the settlement agreement, DLA actually paid the trustee only $880,000. The balance of the $1.7 million, withheld from the trustee, represented the DLA's claimed share as a creditor under the loan guarantee, as well as Dri-Mix's unpaid fees to the United States Department of Agriculture, and tax liability to the IRS.

### The Bank's Claim

After Dri-Mix was adjudicated a bankrupt, the Bank recouped some of its loss in the following manner. By letter of November 28, 1978, the Bank requested payment under the V-Loan II guarantee agreement. As indicated in this letter, Merchants expressly reserved to itself any equitable claims it might have against the United States, the DLA, and the Fed. By letter of December 1, 1978, Branscomb of the Fed recommended payment of the $1.1 million which had been guaranteed. It is noteworthy that in a statement attached to this letter, Branscomb certified that there had been no violation of the guarantee agreement by the Bank. Eight days later, the Bank received $1.1 million as the payment required under V-Loan II. The Bank has received $317,500 from the trustee in bankruptcy which it has allocated to non-MCI contract loans impacted adversely by the breach of the MCI contracts.

Merchants, the Government and the trustee in bankruptcy entered into a settlement agreement which, *inter alia,* expressly reserved the Bank's right to pursue the relief sought in this Congressional Reference case. After payment of the $317,500 above mentioned, the trustee currently holds $300,000, approximately $50,000 of which is owed to the trustee as compensation.

Under the terms of the settlement agreement, should the Bank recover what it claims in this proceeding, it shall receive nothing further from the funds currently held by the trustee. Should it recover less than the amount claimed in this proceeding, Merchants would receive a relatively small dividend from the trustee, as one of a number of unsecured creditors, in accordance with a formula set forth in the agreement. Under the formula, the Bank could in no circumstances receive in the aggregate more than it seeks in this proceeding.

### Discussion

Defendant's principal argument in opposition to a favorable recommendation on this Congressional Reference is that the historical Congressional Reference system enunciated in 28 U.S.C. § 1492 and 28 U.S.C. § 2509, as interpreted and applied in a large number of cases by this court and its predecessor, the United States Court of Claims, has no application to facts such as these. The argument proceeds on the assumption that there is a precise definition of "equitable" claim; that this definition has been the subject of much "learned debate" and that the rule "now" is that an equitable claim must rest on the Government's *wrongful acts* or *negligence,* such as would have supported a *legal* claim against a *private* party. But, the argument proceeds, the Government, unlike a private party, enjoys sovereign immunity whenever the acts of its employees are beyond the *actual* (as distinguished from the ostensible) scope of their employment. Therefore, the Government itself is not chargeable in this case with any wrongful acts or negligence and "the Bank is in a position no different from, and certainly no more equitable than, hundreds of other claimants who have relied to their detriment upon unauthorized statements of Government agents."

Upon analysis, this circular reasoning is nothing less than an expression of dissatisfaction by counsel with the Congressional Reference system itself. It ignores, for example, the terms of the Congressional

---

**28.** There is some evidence in the record that DLA was "encouraged" to negotiate after the presiding Administrative Judge at the ASBCA characterized the Government's breach at a pretrial hearing as "egregious". This is not relied upon as a finding in this application for equitable relief. It is worth mentioning as an explanation of the reversal of DLA's position on the trustee's claim for breach.

Reference. Senate Resolution 291 asks the court to proceed in accordance with the above-cited statutes *"notwithstanding* the \* \* \* bar of *sovereign immunity."* (Emphasis supplied.) It is impossible to conceive of a set of facts warranting consideration for equitable relief under defendant's definition and analysis. For example, if wrongful and negligent acts are demonstrated in a given case, equitable relief is resisted on the grounds that the Government is uniquely immune from wrongful acts of its agents performed within the scope of their authority, if hand, the acts were not in fact authorized. If, on the other hand, the acts of its agents were expressly authorized, then equitable relief is resisted on the grounds that legal relief would be available in that case, thus barring any claim for equitable relief.[29]

■ Although the record in this case is replete with evidence of negligence or wrongful acts by the defendant in the administration and breach of these MCI contracts and the related loan agreements, it is

useful to point out that it has not, as now argued by defendant, been universally necessary to support an equitable claim with a showing of negligence and wrongful acts such as would be necessary to support a legal claim against a private party. The substantive statutory language underlying Congressional Reference cases has been unchanged since 1911 and essentially unchanged for decades prior to that.[30] During that long history, a considerable body of case law has developed under that same statutory language. Those cases illustrate that each claim for equitable relief is to be considered on its own facts, in determining whether grounds for equitable relief are present. In the oft-cited case of *Burkhardt v. United States*,[31] the court stated that "the term 'equitable claim' as used in 28 U.S.C. § 2509, is not used in a strict technical sense, meaning a claim involving consideration of principles of right and justice as administered by courts of equity, but the broader moral sense based upon equitable consideration." [32]

---

**29.** The legislative history of the relevant statutes illustrates clearly that the Congress intended that the court assist it in determining the "complex issues of fact which must be resolved before the Congress can determine whether the relief requested ought to be granted", and not to impede that Congressional evaluation with circular and legalistic arguments such as these. *See* 1966 U.S.Code Cong. & Ad.News 3494.

*See also, Burt v. United States*, 199 Ct.Cl. 897 (1972), which is cited by defendant. It is stated therein that: "For present purposes, then, 'equity' means that in the circumstances under consideration the Government would be legally liable *but for one or more extrameritorious defenses that accrue to it by virtue of its sovereign status."* [199 Ct.Cl. at 906.] [Emphasis supplied.]

**30.** *See* Act of March 3, 1911, Chap. 231, § 151, 36 Stat. 1138.

**31.** 113 Ct.Cl. 658, 84 F.Supp. 553 (1949).

**32.** *Id.* at 667, 84 F.Supp. 553. Defendant argues that this is mere dicta. But the *Burkhardt* court was relying for this statement in its opinion on two decisions of the U.S. Supreme Court, as follows:

"In *Pope v. United States*, 323 U.S. 1, 9, 65 S.Ct. 16, 21, 89 L.Ed. 3, the Supreme Court said:

We perceive no constitutional obstacle to Congress' imposing on the Government a new obligation where there had been none before,

\* \* \*. The power of Congress to provide for the payment of debts, conferred by Section 8 of Article I of the Constitution, is not restricted to payment of those obligations which are legally binding on the Government. It extends to the creation of such obligations in recognition of claims which are merely moral or honorary.

\* \* \* \* \* \*

" \* \* \* In *United States v. Realty Company*, 163 U.S. 427, at page 440, 16 S.Ct. 1120, at page 1125, 41 L.Ed. 215, the Supreme Court said:

Under the provisions of the Constitution (Article I, Section 8) Congress has power to lay and collect taxes, etc., "to pay the debts" of the United States. Having power to raise money for that purpose, it of course follows that it has power when the money is raised to appropriate it to the same object. What are the debts of the United States within the meaning of this constitutional provision? It is conceded and indeed it cannot be questioned that the debts are not limited to those which are evidenced by some written obligation or to those which are otherwise of a strictly legal character. The term "debts" includes those debts or claims which rest upon a merely equitable or honorary obligation and which would not be recoverable in a court of law if existing against an individual. The nation, speaking broadly, owes a "debt" to an individual when his claim grows out of gener-

The Congress has demonstrated the same view of its own powers in this area, as enunciated in *Burkhardt* and by the U.S. Supreme Court.[33] There is no reason to believe that the power of this court to recommend relief based on a moral obligation is any narrower than the legislative mandate contained in the statute which authorizes the Congress to seek the assistance of this court in such cases. Subdivision (c) of 28 U.S.C. § 2509 clearly requires the "hearing officer to whom a congressional reference case is assigned by the chief judge (to) proceed in accordance with the applicable rules to determine the facts, including facts relating to delay or laches, facts bearing upon the question whether the bar of any statute of limitation should be removed; or facts claimed to excuse the claimant for not having resorted to any established legal remedy. He shall append to his findings of fact conclusions sufficient to inform Congress whether the demand *is a legal or equitable claim or a gratuity*, and the amount, if any, *legally or equitably* due from the United States to the claimant." (Emphasis supplied.)[34]

A comprehensive law review article[35] which analyzes the definition of an "Equitable Claim"[36] offers a number of illustrations of unsuccessful efforts by the Government to shrink the *Burkhardt* definition. *Town of Kure Beach v. United States*,[37] treating with three cases which appeared to require a "wrongful act" to support an equitable claim, clarified that misunderstanding as follows:

> When read in proper context these three cases * * * mean only that when a claimant seeks to establish an equitable claim on the basis of "some unjustified act or omission to act" as the cause of damage, he must prove his case, both the fault and the causation. The excerpt from the opinion in *B Amusement Company* on which defendant relies cannot validly be read to impose a limitation on all "equitable claim" cases in the category of *Burkhardt.* There was no "fault" in *Burkhardt*, which is the bellwether of the doctrine. If the court had intended

---

al principles of right and justice; when, in other words, it is based upon considerations of a moral or merely honorary nature, such as are binding on the conscience or the honor of an individual, although the debt could obtain no recognition in a court of law. The power of Congress extends at least as far as the recognition and payment of claims against the government which are thus founded. To no other branch of the government than Congress could any application be successfully made on the part of the owners of such claims or debts for the payment thereof. Their recognition depends solely upon Congress, and whether it will recognize claims thus founded must be left to the discretion of that body. Payments to individuals, not of right or of a merely legal claim, but payments in the nature of a gratuity, yet having some feature of moral obligation to support them, have been made by the government by virtue of acts of Congress, appropriating the public money, ever since its foundation. Some of the acts were based upon considerations of pure charity. * * *"
*See also, U.S. v. Willow River Power Co.,* 324 U.S. 499, 65 S.Ct. 761, 89 L.Ed. 1101 (1945).

**33.** *See* note 29, *supra,* for legislative history in the Senate. The House Committee on the Judiciary similarly interprets its charter to act in these matters:

"In connection with its jurisdiction over claims, the subcommittee considers private bills extending relief to individuals who have no other existing remedy. The right to petition for a redress of grievances is guaranteed by the Constitution. When called upon to decide whether relief should be granted persons seeking redress of grievances, the subcommittee is guided by principles of equity and justice. The task of the subcommittee is to determine whether the equities and circumstances of a case create a moral obligation on the part of the Government to extend relief to an individual." [House Comm. on the Judiciary, Subcomm. on Administrative Law and Governmental Relations (98th Cong.), Rules, at 4.]

**34.** *See also* Jacoby, *Recent Legislation Affecting the Court of Claims,* 55 Geo.L.J. 397, 421 (1966); M. Bennett, *Private Claims Acts and Congressional References,* 90th Cong., 2d Sess 1 (Comm. Print 1968).

**35.** Glosser, *Congressional Reference Cases in the United States Court of Claims: A Historical and Current Perspective,* 25 Amer.U.Law Rev. 595.

**36.** *Id.,* Section V at p. 617.

**37.** 168 Ct.Cl. 597 (1964).

such a limitation on the doctrine as a whole, it would have said so in unmistakable terms.[38]

In short, a few recent cases supporting equitable relief on the basis of wrongful or negligent acts can speak for the facts in those cases only, and they cannot overturn the time-honored statutory rule, as enunciated in *Burkhardt* and its numerous progeny. A wrongful act or omission *may* be the basis for a decision recommending equitable relief, but it is by no means the only basis.[39] The meaningful distinction between Congressional Reference cases and other cases still exists.

Turning to the facts in this case, and to a consideration of the merits of this claim for equitable relief, plaintiff charges defendant with overcomplicating, confusing and obfuscating the essential facts in a vain effort to show that defendant committed no wrongful acts and in no way caused plaintiff's losses. Be that as it may, the essential, operative facts and the unbroken chain of events earlier detailed are restated and summarized at this point in order to examine the causal connection, if any, between defendant's acts or omissions and plaintiff's losses.

There can be no question that Dri-Mix was highly competent and had successfully performed a series of contracts for the Government prior to this chain of events. It is also clear that its contracts, and its ability to perform successfully, were closely linked to and intertwined with its financial arrangements with plaintiff bank. Start-up costs were financed by the Bank until contract proceeds could take over and reduce the loans from the Bank. That same interdependent relationship was contemplated for these MCI contracts. Without that relationship, Dri-Mix could not have accepted award of contracts by the Government, and without those contracts, the Bank could not have extended credit to Dri-Mix. These arrangements had been made prior to the acceptance of each contract by Dri-Mix.

The breach of the MCI contracts by the Government completely frustrated that previously successful arrangement. It occurred right at the outset of performance. It was a material breach because it made it impossible to perform this contract in the only way in which it could be performed, namely, by the assembly line method. Only in this way could the millions upon millions of components be assembled and shipped within the time allotted by the contract. All of the components for assembly into a single unit had to be on hand for performance to begin and to proceed. This is the undertaking in the MCI contracts which the Government breached. The breach caused Dri-Mix to incur enormous but unproductive costs for warehousing, demurrage and labor, and it simultaneously prevented the generation of offsetting contract earnings which could be realized only by the completion and shipment of finished units. The breach was, in fact, the sole reason for the original V-Loan agreement. But for the breach, there would have been no need for a V-Loan. The original line of credit had been constructed for a contract

---

**38.** *Id.,* at 622–23. *See Rumley v. United States,* 169 Ct.Cl. 100 (1965), a case in which there was no evidence of negligence or a wrongful act by the Government. Nevertheless, the court held: "In short, while the plaintiff had no legal right to have the contract rescinded, the circumstances of this case are such that it would be 'unequitable' to allow the counterclaim * * * to prevent plaintiff from recovering * * *." Similarly in *Ghitescu v. United States,* 201 Ct.Cl. 823, 827–34 (1973); *Southwest Metro. Water Dist. v. United States,* 194 Ct.Cl. 994, 1003 (1971); *Wedel v. United States,* 186 Ct.Cl. 937 (1968); and *Froman v. United States,* 157 Ct.Cl. 661, 669–72 (1962), there were recommendations for relief based solely on equitable considerations, in the broad nonjuridical sense. There were no wrongful acts or omissions by the Government such as would have supported a legal claim against a non-Governmental defendant.

**39.** It is noteworthy that the *Burkhardt* rationale has been followed in a number of cases where wrongful acts of the Government were *also* involved. *See,* for example, *Phillips v. United States,* 207 Ct.Cl. 924, 929 (1975); *O'Brien Dieselectric Corp. v. United States,* 207 Ct.Cl. 903, 923 (1975); *Clarkson v. United States,* 194 Ct.Cl. 963, 972 (1971); *Drake America Corp. v. United States,* 168 Ct.Cl. 318 (1964); *O'Donnell v. United States,* 166 Ct.Cl. 107, 117–18 (1964).

which was being performed, not one that was being breached so as to render performance impossible.

The record shows that throughout this time the Government was internally acknowledging its probable responsibility for payment of damages for its breach but was at the same time stoutly resisting payment of any damages. During this period, recognition of the validity of the claim would have avoided default on the MCI contracts and the related loan agreements.[40] When DLA finally settled the claim for breach with the trustee in bankruptcy,[41] it was far too late to remedy the damages on these contracts. Ironically, the Government received a share of its settlement, as a creditor in bankruptcy under the loan guarantee agreement.

The Government argues that this breach and the failure to acknowledge it was not a "wrongful act" under its theory, previously discussed, that a Congressional Reference claim must in all cases be founded upon a negligent or wrongful act. The breach, it argues, was of Dri-Mix's contracts, not those of the plaintiff bank. This argument totally ignores the tight relationship and interdependence of the MCI contracts and the financial arrangements with Merchants, without which those contracts could have been neither awarded nor performed. The argument is rejected.

 The argument is also made that the breach was not a wrongful act by the Government because the delays and disruption on the Dri-Mix contracts were caused by the suppliers of components under other contracts with DLA and not by DLA. That argument ignores the fact that the Government's contracts with Dri-Mix provided that all necessary components would be furnished as needed. There was no privity of contract between Dri-Mix and a multiplicity of suppliers under separate contract to DLA. The record shows that DLA had failed to solicit bids for missing meal components until November 1976 and then provided for their delivery in March 1977, four months after the Dri-Mix assembly contract was to begin. This argument must also be rejected.

As previously noted, the breach and the consequent damages resulted directly in the need for the original V-Loan. With a guarantee, the Bank could extend additional credit to Dri-Mix permitting both parties to "carry" the costly consequences of that breach until a remedy was provided. Instead, that V-Loan agreement was abruptly canceled after almost all of the advances thereunder had already been made in reliance upon loan agreements approved by both DLA and the Fed.

Defendant sees no negligence nor wrongful acts in this series of events because, as it argues, the approval and the subsequent cancellation involved what it describes as a "close" question of statutory interpretation. Therefore, the argument goes, Assistant General Counsel Hillin, to whom all responsibility in these matters had been delegated, was perfectly reasonable in interpreting the statute so as to approve issuance of the V-Loan guarantee; and later on, after reliance thereon by Dri-Mix, the Bank, and the Fed, General Counsel Kabeiseman was also perfectly reasonable in overruling Hillin. Nor was Tovar, as a member of the Committee charged with issuing implementing regulations, negligent in failing to conform the regulations when the statute was presumably changed.

The simple answer to this argument is that, if the statutory construction involved such a "close" question, it was negligent and wrongful to overrule Hillin without a clear necessity to do so, after all of the parties had proceeded in reliance on Hillin's interpretation. On the other hand, if the overruling of Hillin was not a "close" question, then it was negligent and wrongful to

---

**40.** DLA denied an equitable claim for damages based on its breach which Dri-Mix had brought under Public Law 85–804. Later, when a legal claim for breach was pending before the Armed Services Board of Contract Appeals, the hearing member at a pre-hearing conference characterized the breach as "egregious".

**41.** For less than half the amount claimed by the trustee.

totally delegate authority in this area to Hillin and Tovar, knowing that the parties would act thereon to their detriment.

This is the same argument earlier reviewed, namely, that Hillin and Tovar acted without express authority in approving the original V-Loan and that the sovereign is not responsible for the unauthorized acts of its agents. The only usefulness of these arguments is that they serve to explain why this is a claim based on equity and brought under the Congressional Reference statute, rather than an action at law. Because of this intra-agency squabble regarding the proper interpretation of the V-Loan statute, had plaintiff brought a claim at law on theories of breach of contract, estoppel and misrepresentation, it would have been met with the defense that the Government is not legally liable for the unauthorized acts of its agents, the same argument made in this case.

After Kabeiseman had overruled Hillin, he wanted to advise the parties at once rather than to wait for "an eventual default". The Director of DLA, being more concerned with continuation of MCI production, would have preferred to defer the bad news in order to avoid an immediate stoppage of credit and therefore production. A compromise strategy was therefore developed as set forth at note 19, *supra*. Weighing the huge losses which the Government would incur with a cessation of production, it was concluded that it was necessary "to entice the bank to stay with the contractor" by mentioning consideration of a follow-on contract for Dri-Mix and development of a claim against the Government for the breach of contract in delivering components, as earlier detailed. A meeting would be arranged to discuss the guaranteed loan program with Bank personnel.

That meeting was highlighted by shock at the bad news, followed by clear offers of assistance and willingness to stand by the Bank to remedy the statutory problem which Kabeiseman had uncovered. As detailed above, that technical and legislative problem was in fact cooperatively resolved

in due course. In the interim, the Bank continued to finance Dri-Mix and to supply the necessary certifications to the Fed just as it had prior to the cancellation of the V-Loan. Kabeiseman had anticipated that Dri-Mix would require between $2–3 million to complete the two guaranteed contracts. This, coupled with the continuing failure to do anything about the unproductive costs resulting from defendant's breach in furnishing components in a timely and balanced sequence, and the continuing advances by the Bank, dictated that the replacement V-Loan would necessarily be in a larger amount than the one which had been canceled. This is also reflected in the fact that $5 million had in the meantime been appropriated to remedy the perceived legislative problem which had prompted the cancellation.

With this background, DLA entered into the negotiations for the replacement V-Loan with an attitude which was in complete disregard of the events preceding those negotiations. By this time, DLA's need for MCIs had been fulfilled to some extent. A "talking paper" prepared in anticipation of those negotiations illustrates a lack of good faith on the part of DLA's negotiators. Their purpose was, as Hillin testified, to "give enough money and give enough protection to the bank to assure that we'd get some sort of continued production under the contract which meant we had to—the bank had to feel comfortable, maybe not, real comfortable, and Dri-Mix had to feel that it got enough money to continue production of the contract." He acknowledged that DLA had "won the agreement. * * * We knew they needed one."

DLA's initial offer was to guarantee only $500,000 of the $2 million Merchants then had outstanding. Finally, on a "take it or leave it" basis Merchants was offered a guarantee of $1.1 million, and this was further conditioned on the Bank's providing an additional unguaranteed $500,000 revolving credit to Dri-Mix.

Faced with a "take it or leave it" situation, the Bank took this "final offer" under

protest and under duress because it had no alternative except the bankruptcy of Dri-Mix, which then had an indebtedness of $2.2 million. Hillin acknowledged in his testimony that the V-Loan II agreement was a "really unfair" and that DLA had a "superior (negotiating) position". He did not think that would settle the matter and end the problem, but would merely postpone it. Tovar testified that he did not know why he stopped at the $1.1 million figure.

These negotiations provide further evidence of wrongful acts [42] warranting equitable relief in this case. Defendant argues that V-Loan II was a better deal than the canceled V-Loan I. The figures themselves negate that argument. Furthermore, defendant chooses to ignore the continuing and certified advances made between cancellation of the first, and negotiation of the second, V-Loan. It also ignores a continuing refusal to recognize the unproductive costs flowing from Government-caused delays and disruption in furnishing the components. Those facts supported a larger loan guarantee at the time of these negotiations, not a substantially smaller one.

Defendant offers another theory with respect to the negotiations for V-Loan II. It characterizes the latter as a "substitute" contract, that is, an accord and satisfaction settling all grievances which preceded it. Issues such as "release" and "accord and satisfaction" are determined by ascertaining the intent of the parties, and no such intent can be drawn from this record. The testimony of Hillin, above cited, describes the character of the negotiations and his opinion that they would not settle the matter. The Bank's representatives were even more strongly of that opinion. When DLA settled its obligation under the V-Loan II guarantee, the Bank expressly reserved its rights to recover its further losses. There was a similar reservation of rights when

the Bank received a portion of the settlement by the trustee of the claim for defendant's breach of contract.

There is an issue with respect to the amount of relief which should be recommended on this claim for equitable relief. Plaintiff details remaining losses which at "a minimum" total $1,468,844.78. This calculation includes not only lost principal advanced to Dri-Mix but interest thereon which has not been recovered. The bill (S. 2052) referred for consideration by Senate Resolution 291 "would authorize payment * * * of up to $809,609 * * *." With respect to this limitation, plaintiff responds that the measure of damages in a Congressional Reference action is based on the usual equitable adjustment principles otherwise utilized by the court.[43] It is further argued that "where the Government has acted inequitably and improperly, the plaintiff should be entitled to recover its losses (including attorneys' fees and interest) proximately caused by and directly relating to the actions of the Government. * * * In this connection, the Court during trial granted Plaintiff's motion to amend the pleadings pursuant to Rule 15(b), but reserved judgment on the question of whether the amount of damages in a Reference action could be increased above that figure provided in the Reference to the Court. This question was answered affirmatively in *North Counties Hydro-Electric Co. v. United States,* 170 Ct.Cl. 241 (1965)."

In the cited case, the court was asked to consider damages, inter alia, which had occurred subsequent to the Congressional resolution which referred that case to the court. It held:

Under these circumstances, we deem it wholly appropriate to include consideration of that flood in our report to Congress and thus obviate additional litigation. * * * Plaintiff's recovery should include not only the stipulated amount,

---

**42.** Under defendant's "wrongful act as a prerequisite" theory of equitable relief, in Congressional Reference cases.

**43.** Citing *Datronics Engineers Inc. v. United States,* 210 Ct.Cl. 665 (1976); *Concrete Industries*

*(Monier) Ltd. v. United States,* 205 Ct.Cl. 811 (1974); *Attinello v. United States,* 197 Ct.Cl. 1040 (1972); and *Clarkson v. United States,* 194 Ct.Cl. 963 (1971).

but also compensation for the delay in payment of plaintiff's losses. *Cf. Burkhardt v. United States, supra* at 669. For more than 20 years, plaintiff has persistently sought a remedy for its losses and damages. It has had three extensive trials in litigating the issues at great expense. The broader equity demands that an allowance be made for the delay in payment.

■ The facts in this case differ. Losses were incurred prior to the Senate resolution referring the claim, and the reference specifically alludes to an authorization of payment "of up to $809,609". It is concluded that any amount in excess of that figure, based on equitable considerations, would in these circumstances be for the Congress to evaluate.

■ Defendant, on the other hand, argues that no equitable relief should be recommended at all. In addition to the arguments disposed of earlier, it argues in effect that plaintiff would have suffered its losses absent any of the negligent and wrongful acts above detailed. The record is devoid of support for that conclusion. To reach it, defendant ignores the unbroken chain of events which inevitably led to those losses; the breach of the MCI contracts at the outset of performance; the assurances urging advances [44] to Dri-Mix pending approval of V-Loan I, as an antidote for that breach pending settlement; the failure to confront the damages for that breach until after bankruptcy; the abrupt cancellation of V-Loan I, coupled with assurances that this technical problem could be cured by legislation which DLA helped to draft; the continually expressed and urgent need for MCIs to encourage additional advances to Dri-Mix pending an appropriation for the replacement V-Loan; followed by hard negotiations and an inadequate V-Loan II motivated by a diminishing need for MCIs. At no point in this unbroken chain of events did it appear that the

Bank's losses could have been mitigated by an abrupt discontinuance of its financing arrangement with Dri-Mix and, indirectly, with DLA. The alternatives were always worse.

It is no answer to itemize and to compartmentalize the monetary consequences of each of these negligent and wrongful acts, as defendant does, and then to speculate as to the amount of loss which would have been sustained had each particular wrongful act not occurred. That ignores the breach which triggered this series of events, the connective periods, and the overall effect of this unbroken chain of events. Without these wrongful acts, no losses would have been incurred.

Defendant's suggestion, first raised in the negotiations for V-Loan II, that there were deficiencies in the administration of V-Loan I, has an "afterthought" quality. It appears to have been introduced to support the abrupt change in attitude which surfaced during the V-Loan II negotiations. It is largely based on Tovar's speculation as earlier detailed, and it finds no support in the record. That record shows that the Bank acted throughout in a conservative manner and in accordance with instructions which it solicited and received from DLA and the Fed.[45]

### Ultimate Findings

1. The DLA failed to deliver GFM in a timely and orderly manner, as required by its MCI contracts. Without all components at hand in 20 percent increments, Dri-Mix could not even begin production and assembly of the units. The huge number of units to be assembled could be produced only by an efficient assembly line method which Dri-Mix had designed on the essential supposition that components would be furnished by DLA for assembly in a timely and orderly manner. Dri-Mix received nearly 100 percent of other components

---

**44.** Which Hillin testified were "perfectly legal". Transcript 1745–46.

**45.** In settling with the Bank to the extent permitted by V-Loan II, Branscomb of the Fed certified that the V-Loans had been properly administered.

before it received the missing and essential meat component.

2. Dri-Mix was not at fault for these delays in the furnishing of the components by DLA. The delays greatly extended the delivery dates of the MCIs. As an additional consequence, Dri-Mix was also forced to expend large sums for extra warehouse space, demurrage charges, and labor costs. The additional unproductive costs and damages suffered were the direct consequence of a breach of the MCI contracts by the defendant, growing out of its failure to deliver the components in a timely and orderly manner, as the contracts required.

3. In addition to these large and unforeseeable expenditures, the breach caused Dri-Mix's cash flow to dry up because it could not receive contract progress payments from the Government until it had produced and shipped complete MCI units. But it could not produce and be paid for complete MCIs until it had received all the components from the Government.

4. The resulting cost excalation, and drying up of its cash flow, outstripped both Dri-Mix's estimated start-up costs and its available line of credit. Those estimated start-up costs and available line of credit would have been sufficient had the DLA not breached its contract to supply all the components in a timely and orderly manner, i.e., in 20 percent increments, so that production of each succeeding increment could be financed out of the contract proceeds received on shipment of the preceding 20 percent increment.

5. As a result of the damages resulting from the breach, Dri-Mix's regular bank, Merchants, applied for a Government-guaranteed V-Loan, as the suggested method of providing the necessary additional operating capital to Dri-Mix.

6. The Government guarantees were arranged under the direction of and with the approval of both the DLA and its fiscal agent, the Fed, because the MCIs were urgently needed by the DLA to meet a worldwide shortage. Immediately after the application for the V-Loan was filed, both Merchants and Dri-Mix received strong assurances from DLA and the Fed that the application would be approved, as it subsequently was. These assurances and commitments from DLA and the Fed warranted the continuation of advances to Dri-Mix by Merchants in excess of its normal credit limits, while the V-Loan application was pending and prior to its formal approval. *See* footnotes 9 and 44, *supra*, and corresponding text. Merchants at all times proceeded cautiously and prudently to insure that it was complying with the requirements of the V-Loan Guarantee Agreement and the Loan Agreement. It sought clarification and instructions from DLA and the Fed whenever necessary and followed the instructions it received. There is no evidence of maladministration of those agreements by Merchants.

7. When almost the entire guaranteed amount had been advanced by Merchants, DLA abruptly revoked the loan guarantee. The revocation was based on the reversal by the General Counsel of DLA, of his office's and the Comptroller's original interpretation of the applicable statute, as it had been interpreted and administered by the Assistant General Counsel of DLA in charge of such fiscal matters. The statute was susceptible to both interpretations, as illustrated by testimony at trial. The interpretation by the Assistant General Counsel of DLA for fiscal matters is persuasive. It was his interpretation that funds are appropriated for items to be procured, such as these MCIs. When earned by the contractor, they are used to pay off the loans which have been guaranteed by the Government. Thus in most cases the guarantee is only a contingent liability, for which funds are not normally appropriated "in advance". The use of those words in the statute could be satisfied by the appropriation "in advance" of the funds necessary to pay for the items being procured. The recent guaranteed loans to the Chrysler Corporation represent an example of Government-guaranteed loans which ultimately involved no expenditure by the

Government and for which "advance" appropriations would not have been required.

8. The guarantee revocation action by the General Counsel had been preceded by an audit conducted by representatives of the Defense Contract Audit Agency. There was no explanation offered at trial for the priority status assigned to this audit. The auditors, working for a different agency, were not aware of the prior circumstances surrounding the late and unbalanced delivery by DLA of the MCI components, which had crippled production and created the financial crisis which they were auditing. Their report concluded that it would be difficult for Dri-Mix to complete its contracts and repay the Government-insured loans.

9. On the day before the DLA revoked the V-Loan guarantee, it held a meeting to plan a strategy on giving Merchants the bad news while at the same time inducing Merchants to continue financing Dri-Mix and production of the urgently needed MCIs. The evidence of record shows that "to entice the bank to stay with the contractor", the possibility of a follow-up contract to Dri-Mix was to be raised, as was the right of Dri-Mix to develop a claim for the untimely and unbalanced shipment of MCI components by DLA.

10. The voiding of the loan guarantee left Merchants greatly extended beyond its self-imposed limit of about $500,000. DLA, at the same time that it declared the loan guarantee void, suggested the remedy in the form of an amendment to the 1978 Defense Appropriations Act, specifically earmarking money to cover any contingent liability by the Government under the guarantee. DLA even provided the specific language for the amendment to the appropriation bill and promised to "stand by" the Bank and do all it could to help out. DLA was strongly interested in this legislative solution in order to meet its own objective of meeting the worldwide shortage of MCIs. The Bank was concurrently being advised by DLA of the continuing, urgent need for the MCIs to meet a worldwide shortage.

11. Merchants cooperated with DLA by continuing to finance production by Dri-Mix until the necessary substitute loan guarantee could be authorized and issued. It had no reasonable alternative. Moreover, it felt a patriotic duty to assist the military in fulfilling its urgent need for MCIs. During this period, Merchants continued to provide appropriate certificates to the Federal Reserve Bank in Atlanta, advising the Government of its continuing advances, with the supporting data. The Congress thereafter appropriated $5 million specifically for V-Loan guarantees.

12. By this time, however, Dri-Mix had produced a substantial quantity of MCIs and DLA no longer felt an urgent need for them. These facts influenced DLA in the subsequent negotiations for the loan guarantee necessary to replace the one which it had canceled.

13. Because of the continuing advances which had been made in the interim, pending authorization by Congress of specific V-Loan guarantees, Merchants required a somewhat larger V-Loan guarantee to replace the original one which had been voided by the change of statutory interpretation within DLA. It applied for a new V-Loan guarantee in the amount of 85 percent of $2.6 million. This was consistent with the understandings earlier reached. But DLA refused to stand by those earlier assurances. It offered as an excuse prior maladministration of the canceled V-Loan by the Bank. But there is no evidence establishing the alleged maladministration. There is no mention of maladministration of the original V-Loan program in the report of the meeting at which it was canceled. On the contrary, there were offers of assistance and actual assistance in securing authorization for a replacement V-Loan guarantee. Alleged deficiencies in administration of the original V-Loan were not mentioned until negotiations for the replacement V-Loan were under way.

14. DLA offered a smaller loan guarantee than the original one it had declared void. Furthermore, as a condition to issuing any loan guarantee, the Bank was re-

quired to advance an additional $500,000 in an unguaranteed line of revolving credit. This offer by DLA was on a "take it or leave it" basis. One of the negotiators for DLA stated this was as high as he was authorized to go. This was not true. He was authorized to guarantee up to 100 percent of a $2 million loan, an amount roughly equal to the 85 percent of $2.6 million requested by the Bank. In contrast, the amount DLA was willing to guarantee on a "take it or leave it" basis was just sufficient to permit procurement of the additional MCIs required, but insufficient to spare Dri-Mix from bankruptcy and Merchants from a default on its loans to Dri-Mix. It was an amount far less than had been appropriated by the Congress. The only alternative to acceptance by Merchants would have been the immediate cessation of production, bankruptcy of Dri-Mix, and default on the loans.

15. Based on misstatements by the DLA negotiator regarding the limits of his authority, the Bank reluctantly accepted the substituted V-Loan guarantee, but under protest and under duress. Merchants thereafter made alternative suggestions which might have permitted Dri-Mix to complete its contracts, but they too were rejected. Subsequently, Dri-Mix was unable to meet its payroll and went bankrupt.

16. DLA then terminated the Dri-Mix contracts "for default", although the evidence clearly shows that it expected all along that the default termination would thereafter be converted to a termination for the convenience of the Government, requiring payment of damages to Dri-Mix. Moreover, the GFM in Dri-Mix's warehouses was rapidly deteriorating and would represent a further loss to DLA.

17. The trustee in bankruptcy for Dri-Mix sued to have the termination for default changed to a termination for convenience and for the damages resulting from DLA's failure to deliver components for the MCIs in a timely and orderly manner, as required by its contracts.

18. The value of Dri-Mix's claims, as evidenced by a report furnished to the trustee in bankruptcy, was about $4.6 million. The trustee eventually settled Dri-Mix's claims against the Government for $1.7 million. This amount was recovered for the benefit of all creditors. It was recovered far too late to prevent default of the Dri-Mix contracts and default of the Merchants loans.

19. Had the DLA not wrongfully refused to recognize the validity of Dri-Mix's entitlement to recover its additional costs directly resulting from DLA's failure to deliver components for the MCIs in a timely and orderly manner; and/or had DLA not voided the original V-Loan guarantee which it had previously approved, after the funds had been advanced by the Bank; and/or had DLA not refused to substitute an adequate V-Loan guarantee for the one it had voided, after the Congress had specifically appropriated funds for that purpose, Dri-Mix would undoubtedly have completed its contracts and been able to repay its loans to Merchants out of contract proceeds, including claim recovery. The record does not show fault on the part of Dri-Mix or Merchants for the defaults which have occurred.

20. Dri-Mix had successfully and profitably performed all of its prior contracts with the DLA. It would have successfully and profitably performed the non-MCI contracts which were under way when the MCI contracts were awarded had the Government not breached the MCI contracts. The breach consisted of a failure to furnish components in a timely and orderly manner. It was aggravated by the approval and then cancellation of the original V-Loan guarantee and by the refusal to replace that guarantee with an adequate V-Loan guarantee, after Congressional authorization to do so.

*Conclusion*

On the basis of the evidence of record, it is recommended that the Congress authorize payment to The Merchants National Bank of Mobile, Alabama, of the sum of $809,609, in full settlement of all its claims, legal or equitable, against the United

States as compensation for losses sustained as a result of the actions and conduct above described. This is the sum set forth in S.2052, the Bill referred to the court for its findings and conclusion. The Bank has established on the record an actual loss of loaned principal (i.e., excluding interest) in the amount of $928,757.15.